**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                          No. 98-4462

CLINTON BERNARD FRAZIER-EL,
Defendant-Appellant.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Herbert N. Maletz, Senior Judge, sitting by designation.
(CR-96-469-WMN)

Argued: September 24, 1999

Decided: March 2, 2000

Before MURNAGHAN and NIEMEYER, Circuit Judges, and
Frank J. MAGILL, Senior Circuit Judge of the
United States Court of Appeals for the Eighth Circuit,
sitting by designation.

_____

Affirmed by published opinion. Judge Niemeyer wrote the opinion,
in which Senior Judge Magill joined. Judge Murnaghan wrote a dis-
senting opinion.

_____

**COUNSEL**

**ARGUED:** Denise Charlotte Barrett, Assistant Federal Public
Defender, Baltimore, Maryland, for Appellant. Tarra R. DeShields-
Minnis, Assistant United States Attorney, OFFICE OF THE UNITED

STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** James Wyda, Federal Public Defender, Jeffrey E. Risberg, Assistant Federal Public Defender, Baltimore, Maryland, for Appellant. Lynne A. Battaglia, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

_____

## OPINION

NIEMEYER, Circuit Judge:

Clinton Frazier-El was convicted of possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g), and sentenced to 188 months imprisonment as an armed career criminal under 18 U.S.C. § 924(e). On appeal, he contends that the district court erred in (1) refusing to allow him to dismiss his court-appointed attorney and proceed pro se; (2) instructing the jury on the mens rea requirement of § 922(g); and (3) sentencing him as an armed career criminal. For the reasons that follow, we affirm.

I

Clinton Frazier-El purchased a 20-gauge shotgun from a Wal-Mart department store in Catonsville, Maryland, in November 1996, indicating on the required firearms transaction form that he had never been convicted of a crime punishable by imprisonment for a term exceeding one year. When a routine examination of Wal-Mart firearms sales records revealed that Frazier-El had been convicted of a battery and sentenced to a term of five years, law enforcement officers obtained a warrant for Frazier-El's arrest. They executed the warrant at Frazier-El's apartment on December 9, 1996. At the time of his arrest, Frazier-El was holding the shotgun that he had purchased at Wal-Mart a month earlier. He told law enforcement officers that he had "papers for the gun" and that, while he knew he was prohibited from possessing a handgun, he did not know he was prohibited from possessing a "long gun."

Following Frazier-El's arrest and the appointment of Jeffrey Risberg, a federal public defender, as his counsel, Risberg filed a motion

for a psychiatric evaluation of Frazier-El's competence to stand trial. At the April 1997 hearing on this motion, Frazier-El told the court, "I would prefer to have Ms. Watts represent me at this time and I am requesting the dismissal of Mr. Risberg as my attorney on these particular grounds and issues." Frazier-El explained that he wanted to file dismissal motions based on the fact that he "was ordained a consecrated sheik under the prophet," a fact that Risberg considered "irrelevant." Frazier-El also stated, "I do not want to be represented by a public defender who thinks that the only defense that I have is to plead insanity or mental incompetency." The district court responded, "I have denied your motion to replace Mr. Risberg with Ms. Watts." At that point Frazier-El announced that Risberg"no longer represents me or speaks for me." The district court directed Risberg to remain as Frazier-El's attorney "in this proceeding for the purpose of this hearing today."

After Dr. Neil Blumberg, a court-appointed psychiatrist, testified at the April 1997 hearing that Frazier-El "was not competent to stand trial" at that time because he was suffering from"schizophrenia paranoid type along with cocaine abuse, prior history of cocaine abuse," Frazier-El stated:

> I dismissed Mr. Risberg before this proceeding started in terms of bringing Dr. Blumberg to the witness stand and have him ask questions. . . . I at this particular point represent myself and I would like to cross-examine Dr. Blumberg since I am representing myself in this hearing.

The court, refusing to grant Frazier-El's request, explained the nature of the hearing and then committed Frazier-El to the custody of the Attorney General for hospitalization, treatment, and further evaluation. When the court indicated that the decision was in Frazier-El's best interest, Frazier-El responded, "I think this case could be more properly handled with another public defender."

Eight months later, after Frazier-El's hospitalization, a second competency hearing was conducted during which the court concluded that Frazier-El was competent to stand trial. The court adopted the conclusions of the "Camp Butner Evaluation Team," which evaluated and treated Frazier-El. The report concluded that Frazier-El "has an

3

understanding of the adversarial nature of criminal law and verbalizes an accurate understanding of criminal process, procedural protection of his rights, and the roles of courtroom personnel." The report indicated, however, that Frazier-El persisted in his view that the United States government does not have authority over him because "he is a Moorish national." The report explained:

> We do not view his belief system to be delusional in nature, as it is loosely based on the doctrine of the Moorish Science Temple of America, a recognized organization in the United States. Mr. Frazier-El appeared to have exaggerated, added to, and distorted the doctrine to benefit himself. We attribute that behavior to his personality disorder and not to a severe mental illness.

During this hearing, Frazier-El spoke at length about the fact that members of the Moorish Science Temple were not subject to the United States courts and that the Moors were "being incarcerated and treated as slaves as federal contraband property." Frazier-El complained that his attorney Risberg worked for the federal government and had "never worked in my interest." When he sought to have Risberg removed as counsel, the court denied the motion.

At a motions hearing conducted on January 20, 1998, the day trial was scheduled to begin, Frazier-El again expressed his dissatisfaction with appointed counsel. He complained that Risberg had refused to file motions arguing that Frazier-El, as "an officer in the Moorish Science Temple," was not subject to the court's jurisdiction. The following colloquy ensued:

> The Court: Is it your position that any attorney-- that you would ask for a new attorney in every instance where the attorney would refuse to file the motions; is that your position?
>
> * * *
>
> The Court: Your position is that the Court has no jurisdiction over you, is that right? That this court has no jurisdiction over you; is that your position?

4

Frazier-El: Well, yes, sir.

The Court: In other words, if you should represent your-
self, you would want to argue that; is that cor-
rect?

Frazier-El: That would be one of the issues.

The Court: Just a minute. If I understand it, I have been
advised this morning that in the event the
Court does not excuse Mr. Risberg and appoint
new counsel, you want to represent yourself;
am I correct?

Frazier-El: Yes, sir.

The Court: And you would argue that this Court has no
jurisdiction, in representing yourself; is that
correct?

Frazier-El: That would be one of the issues, Judge, yes, it
would.

* * *

The Court: If I do not dismiss Mr. Risberg, did you want
to represent yourself? . . . . You want to repre-
sent yourself?

Frazier-El: Yes, sir.

The Court: You want to present -- your basic argument
would be that this Court has no jurisdiction
over you; is that right?

Frazier-El: That is one of the basic arguments.

* * *

5

> The Court: In other words, if new counsel were appointed and refused the same as Mr. Risberg, to proceed the way you desired, you would want another new counsel; is that correct? You want a lawyer who will take the position precisely that you are suggesting this morning; is that right? That is what you want?

> Frazier-El: Yes, sir. . . . If that is at all possible.

The court denied Frazier-El's motion to substitute counsel and his request to represent himself. In doing so, the court stated its belief that Frazier-El's efforts to substitute counsel and, failing that, to proceed pro se represented efforts "to argue matters which would not be permitted by the court." The court continued:

> He would argue that this Court has no jurisdiction and the Court has ruled that that motion and that argument is absolutely frivolous.

> I think Mr. Frazier-El is in a position where he is not competent because of arguments he has made to represent himself. However, the Court is absolutely convinced that Mr. Frazier-El understands the nature of the proceedings and is able, if he so desires -- he is an intelligent man -- to assist in his own defense, if he so desires.

> I think Mr. Frazier-El is trying to argue in this Court not applicable legal principles but positions taken by an organization whose position is very well known to the courts of this country. Therefore, the motion, Mr. Frazier-El, to represent yourself will again be denied based on the matters which you have presented.

Trial commenced the next morning, with Risberg acting as defense counsel. On January 22, 1998, the jury returned a verdict of guilty, and the court, having determined that Frazier-El had three prior convictions for "violent felonies," sentenced Frazier-El as an armed career criminal under 18 U.S.C. § 924(e). This appeal followed.

6

II

As his principal argument on appeal, Frazier-El contends that the district court denied him his right to represent himself in violation of the Sixth Amendment. See Faretta v. California , 422 U.S. 806, 819 (1975) (holding that the Sixth Amendment implicitly provides an affirmative right to self-representation).

Although the Sixth Amendment guarantees a criminal defendant "the Assistance of Counsel for his defence," U.S. Const. amend. VI, Faretta held that it also protects an implied inverse right of self-representation. And the right of self-representation generally must be honored even if the district court believes that the defendant would benefit from the advice of counsel. See 422 U.S. at 834; see also McKaskle v. Wiggins, 465 U.S. 168, 177 n.8 (1984). Because an exercise of the right of self-representation necessarily entails a waiver of the right to counsel -- a defendant obviously cannot enjoy both rights at trial -- the exercise of the right of self-representation must be evaluated by using many of the same criteria that are applied to determine whether a defendant has waived the right to counsel. An assertion of the right of self-representation therefore must be (1) clear and unequivocal, see Faretta, 422 U.S. at 835; United States v. Lorick, 753 F.2d 1295, 1298 (4th Cir. 1985); (2) knowing, intelligent and voluntary, see Godinez v. Moran, 509 U.S. 389, 400-01 (1993); United States v. Singleton, 107 F.3d 1091, 1096 (4th Cir. 1997); and (3) timely, see United States v. Lawrence, 605 F.2d 1321, 1325 n.2 (4th Cir. 1979).

The particular requirement that a request for self-representation be clear and unequivocal is necessary to protect against "an inadvertent waiver of the right to counsel by a defendant's`occasional musings on the benefits of self-representation.'" United States v. Arlt, 41 F.3d 516, 519 (9th Cir. 1994) (quoting Adams v. Carroll, 875 F.2d 1441, 1444 (9th Cir. 1989). This protection against an inadvertent waiver of the right to counsel is especially important because"representation by counsel does not merely tend to ensure justice for the individual criminal defendant, it marks the process as fair and legitimate, sustaining public confidence in the system and in the rule of law." Singleton, 107 F.3d at 1102.

7

The requirement that a request for self-representation be clear and unequivocal also prevents a defendant from taking advantage of and manipulating the mutual exclusivity of the rights to counsel and self-representation. A defendant who vacillates at trial places the trial court in a difficult position because it "must`traverse . . . a thin line' between improperly allowing the defendant to proceed pro se, thereby violating his right to counsel, and improperly having the defendant proceed with counsel, thereby violating his right to self-representation." Fields v. Murray, 49 F.3d 1024, 1029 (4th Cir. 1995) (en banc) (quoting Cross v. United States, 893 F.2d 1287, 1290 (11th Cir. 1990)). In ambiguous situations created by a defendant's vacilla-tion or manipulation, we must ascribe a "constitutional primacy" to the right to counsel because this right serves both the individual and collective good, as opposed to only the individual interests served by protecting the right of self-representation. Singleton, 107 F.3d at 1102; see also id. at 1096; Fields, 49 F.3d at 1029; United States v. Gillis, 773 F.2d 549, 559 (4th Cir. 1985).

At bottom, the Faretta right to self-representation is not absolute, and "the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer." Martinez v. Court of Appeals of Cal., 120 S. Ct. 684, 691 (2000) (holding that Faretta does not require that a criminal defendant be allowed to represent himself on direct appeal).

With these principles in hand, we now turn to Frazier-El's conten-tion that he was improperly denied his right of self-representation in this case. Any review of this contention must be considered against the background of Frazier-El's overarching contention that, as an "of-ficer in the Moorish Science Temple," he was not subject to the juris-diction of a United States district court. Beginning with his very first hearing, Frazier-El repeatedly instructed his counsel to assert that defense and to subpoena witnesses who were members of the Temple. His dissatisfaction with his appointed counsel resulted from counsel's advice to Frazier-El that his arguments were meritless and irrelevant. And because of this advice from appointed counsel, Frazier-El alter-natively sought representation by counsel who would assert the defense or self-representation.

Frazier-El's first expression of his desire to represent himself came at the first competency hearing, during which he repeatedly insisted

8

that he had dismissed counsel and that he would represent himself at the hearing. This hearing, however, was conducted for the sole purpose of evaluating Frazier-El's competence to stand trial. The court heard expert testimony that Frazier-El suffered from paranoid schizophrenia and that he was incompetent to stand trial at that time. The Supreme Court has made clear that the standard of competence for waiving counsel is identical to the standard of competence for standing trial. See Godinez, 509 U.S. at 396-97. Therefore, the district court's refusal to permit Frazier-El to represent himself until the issue of competency was determined was clearly justified.

At Frazier-El's second competency hearing, he again expressed dissatisfaction with Risberg and sought to have him removed as counsel. Significantly, however, Frazier-El did not express any desire to proceed pro se at this hearing.

Finally, on the day of trial, Frazier-El again sought to have Risberg removed as counsel and substitute counsel appointed. Through questioning, the court elicited the underlying motive for Frazier-El's expression of dissatisfaction with appointed counsel-- namely, the frustration he felt as a result of Risberg's unwillingness to file frivolous motions based on Frazier-El's membership in the Moorish Science Temple:

> The Court: In other words, if new counsel were appointed and refused the same as Mr. Risberg, to proceed the way you desire, you would want another new counsel; is that correct? You want a lawyer who will take the position precisely that you are suggesting this morning; is that right? That is what you want?
>
> Frazier-El: Yes, sir. . . . If that is at all possible.

The court also ascertained that Frazier-El's alternative request for self-representation -- should his request for substitute counsel be denied -- was a manipulative effort by Frazier-El to assert the defenses himself. Thus the court said, "If I do not dismiss Mr. Risberg, did you want to represent yourself?" Frazier-El responded affir-

9

matively, agreeing that he wanted to represent himself in order to present his jurisdictional argument.

The right of self-representation exists "to affirm the dignity and autonomy of the accused and to allow the presentation of what may, at least occasionally, be the accused's best possible defense." Wiggins, 465 U.S. at 176-77; cf. Martinez, 120 S. Ct. at 689 (noting that with the increased availability of competent counsel, the historical reasons for recognizing the right "do not have the same force"). The right does not exist, however, to be used as a tactic for delay, see Lawrence, 605 F.2d at 1324-25; for disruption, see Faretta, 422 U.S. at 834 n.46; for distortion of the system, see Singleton, 107 F.3d at 1102; or for manipulation of the trial process, see Lawrence, 605 F.2d at 1325. A trial court must be permitted to distinguish between a manipulative effort to present particular arguments and a sincere desire to dispense with the benefits of counsel. The circumstances surrounding Frazier-El's purported waiver of his right to counsel and the assertion of his right to proceed without counsel in this case suggest more a manipulation of the system than an unequivocal desire to invoke his right of self-representation. Taking the record as a whole, see Singleton, 107 F.3d at 1097, we are satisfied that the district court was justified, when confronted with Frazier-El's vacillation between his request for substitute counsel and his request for self-representation, in insisting that Frazier-El proceed with appointed counsel. See Martinez, 120 S. Ct. at 691 (in the context of an asserted Faretta right, recognizing the government's interest in "ensuring the integrity and efficiency of the trial").

In denying Frazier-El's intermittent requests to represent himself, the district court stated that "Mr. Frazier-El is. . . not competent because of arguments he made to represent himself." If this particular statement by the court was intended as an explanation for its refusal to permit Frazier-El to proceed pro se, as Frazier-El now contends, it was an error of law. See Godinez, 509 U.S. at 399 ("[T]he competence that is required of a defendant seeking to waive his right to counsel is the competence to waive the right, not the competence to represent himself"); Faretta, 422 U.S. at 836 (defendant's technical legal knowledge "not relevant to an assessment of his knowing exercise of the right to defend himself"). But we must assume that the court's statement that Frazier-El was "not competent because of argu-

10

ments he made to represent himself" refers only to the legitimacy of the request and the arguments advanced, rather than to Frazier-El's ability to make a knowing election of self-representation and waiver of counsel. This assumption is confirmed by what the court said next: "Frazier-El understands the nature of the proceedings and is able, if he so desires -- he is an intelligent man -- to assist in his own defense, if he so desires."

III

Frazier-El next contends that the district court erred in refusing to give the following proposed jury instruction on the mens rea requirement of 18 U.S.C. § 922(g):

> For the government to prove this element beyond a reasonable doubt, you must find that the defendant knew that the firearm he possessed was of a type he was prohibited from possessing.

He argues that this instruction was necessary "because § 922(g) does not prohibit a felon from possessing all firearms." Therefore, he maintains, for the jury to find that he knowingly possessed a firearm, "it should have been required to find that he knew that the firearm bore the characteristics that brought it within the scope of § 921(a)(3), i.e., that the defendant knew that the firearm was of the type that he was prohibited from possessing."

Section 922(g) makes it unlawful for any person "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to . . . possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g). "Firearm" is defined to mean "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3)(A). That section, however, specifically excludes "an antique firearm" from the definition of firearm. Id. The mens rea requirement of § 922(g) prescribes that the defendant act "knowingly" in committing the violation. 18 U.S.C. § 924(a)(2).

11

The district court instructed the jury on the <u>mens rea</u> requirement of § 922(g) as follows:

> The government also must prove that Mr. Frazier-El acted knowingly. This means that he possessed the firearm purposely and voluntarily, and not by accident, mistake or carelessness. It also means that he knew that the weapon was a firearm, as we commonly use the word. However, the government is not required to prove that Mr. Frazier-El knew that he was breaking the law.

We believe that the district court's instruction correctly stated the <u>mens rea</u> required for a violation of § 922(g). Under the district court's instruction, while the jury would have to find that Frazier-El knew that his weapon was a firearm, it would not have to find that he knew the possession of a firearm constituted a violation of law. The conventional <u>mens rea</u> of criminal statutes, unless Congress clearly specifies otherwise, requires not that a defendant know that his conduct was illegal, but only that he "know the facts that make his conduct illegal." <u>Staples v. United States</u>, 511 U.S. 600, 605 (1994); <u>see also United States v. International Minerals & Chem. Corp.</u>, 402 U.S. 558, 559, 562 (1971) (holding that "knowingly violates" means knowledge of the "specific acts or omissions which violate the Act"). <u>See generally United States v. Wilson</u>, 133 F.3d 251, 260-64 (4th Cir. 1997).

In this case, Frazier-El may have mistakenly believed that his shotgun was a "long gun," exempted from § 922(g). But such ignorance of the law provides no defense to a statute's violation. <u>See Cheek v. United States</u>, 498 U.S. 192, 199 (1991). Section 922(g) prohibits the possession by a felon of all firearms, except an antique. In this case there is no assertion that Frazier-El thought his shotgun was an antique. Because his requested jury instruction might suggest to the jury that Frazier-El had to know that his conduct was illegal, the district court did not err in refusing to give it.

It is reversible error to decline a requested jury instruction only if the requested instruction "(1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested

12

instruction seriously impaired the defendant's ability to conduct his defense." United States v. Queen, 132 F.3d 991, 1000 (4th Cir. 1997) (quoting United States v. Lewis, 53 F.3d 29, 32 (4th Cir. 1995)). In this case, if Frazier-El's requested instruction is interpreted to cover only "knowledge" that the defendant possessed a "firearm," it was adequately addressed by the court's instructions. On the other hand, if it is interpreted as a request to require knowledge of a violation, it was properly rejected as a mischaracterization of the law.

IV

Finally, Frazier-El contends that he was improperly sentenced as an armed career criminal under 18 U.S.C. § 924(e). See also U.S.S.G. § 4B1.4. Section 924(e) mandates a 15-year minimum sentence of imprisonment for a person convicted of a § 922(g) weapons offense if that person has "three previous convictions . . . for a violent felony or a serious drug offense." 18 U.S.C. § 924(e)(1). A violent felony is defined as any crime punishable by more than one year imprisonment that

> (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or

> (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

18 U.S.C. § 924(e)(2)(B). While Frazier-El concedes that he has two qualifying convictions for assault, he argues that the district court improperly treated his 1984 conviction for violation of Md. Ann. Code art. 27, § 36, as a violent felony.

To determine whether a prior conviction constitutes a violent felony, a sentencing court must determine whether a prior offense involves the necessary force or risk of injury to another by employing a categorical approach that relies on (1) the fact of conviction and (2) the definition of the prior offense. See Taylor v. United States, 495 U.S. 575, 600, 602 (1990); United States v. Coleman, 158 F.3d 199, 201-02 (4th Cir. 1998) (en banc); cf. United States v. Kirksey, 138

13

F.3d 120, 124 (4th Cir.) (same analysis for U.S.S.G.§ 4B1.1), <u>cert. denied</u>, 119 S. Ct. 122 (1998).

In this case, the 1984 prior conviction that is at issue was for "Deadly Weapon--Int/Injure" in violation of Md. Ann. Code art. 27, § 36, which provides in relevant part:

> Every person who shall wear or carry any dirk knife, bowie knife, switchblade knife, star knife, sandclub, metal knuckles, razor, nunchaku, or any other dangerous or deadly weapon of any kind, whatsoever . . . concealed upon or about his person, and every person who shall wear or carry any such weapon . . . openly with the intent or purpose of injuring any person in any unlawful manner, shall be guilty of a misdemeanor, and upon conviction, shall be fined not more than $1,000 or be imprisoned in jail, or sentenced to the Maryland Department of Correction for not more than three years.

Md. Ann. Code art. 27, § 36(a)(1). By its terms, this provision creates a single offense that "may be committed in two ways: with the weapon carried (1) concealed, or (2) openly with the intent to injure." <u>Eldridge v. State</u>, 619 A.2d 531, 534 (Md. 1993). The district court found that Frazier-El's conviction was for a violation of the second prong, <u>i.e.</u>, carrying a weapon with the intent to injure.* Frazier-El contends that the evidence relied upon by the district judge was insufficient to make this determination.

_____

*We do not address whether a conviction under the first prong of § 36(a)(1), for carrying a concealed weapon, would be a qualifying predicate offense for § 924(e) purposes because the parties did not argue the issue and this court has not yet had occasion to consider it. The decisions of other circuits are split on the issue. <u>Compare United States v. Hall</u>, 77 F.3d 398, 401 (11th Cir. 1996) (carrying concealed weapon "is conduct that poses serious potential risk of physical injury and, so, falls under the [§ 924(e)(2)(B)] definition of violent felony"), <u>and United States v. Gilbert</u>, 138 F.3d 1371, 1372 (11th Cir. 1998) (same conclusion under U.S.S.G. § 4B1.2(1)), <u>cert. denied</u>, 119 S. Ct. 1754 (1999) <u>with United States v. Whitfield</u>, 907 F.2d 798, 800 (8th Cir. 1990) (risk to others from carrying concealed weapon "is not so immediate" as to present serious risk of physical injury).

14

To establish that Frazier-El was convicted of openly carrying a weapon with intent to injure, the district court relied on Maryland court records that contained notations describing the 1984 conviction in two separate documents, respectively, as "Deadly Weapon-- Int/Injure" and "D/W--Int/Injure." Frazier-El argues, however, that these notations do not clearly indicate which type of weapon offense was charged. He maintains that the reference to the conviction as "Deadly Weapon--Int/Injure" describes any § 36(a)(1) violation and could refer to either a concealed weapon violation or an open possession with intent to injure violation. He suggests that the first part of the notation, "Deadly Weapon," refers to the concealment prong of the statute and that the second part, "Int/Injure," refers to the possession-with-intent-to-injure prong. This argument, however, belies the statutory language. Both prongs of § 36(a)(1) require use of a "dangerous or deadly weapon," and the distinction between the two prongs turns on whether the weapon is carried concealed or carried openly. If concealment were the basis of the offense, the entry would not include the "intent-to-injure" qualifier. Rather, the comparable entry would read "Deadly Weapon -- Concealment."

Frazier-El also argues that the length of his sentence -- 89 days -- indicates that the intent-to-injure prong of § 36(a)(1) could not have been the basis of conviction because § 36(a)(2) imposes a three-year mandatory sentence "if it shall appear from the evidence that [the] weapon was carried . . . with the deliberate purpose of injuring the person or destroying the life of another." Independently of § 36(a)(2), § 36(a)(1) criminalizes possession of a deadly weapon with the "intent or purpose of injuring any person." Section 36(a)(2), which imposes the mandatory three-year sentence, does so only when the weapon was carried "with the deliberate purpose of injuring the person or destroying the life of another." While the distinction between an "intent or purpose of injuring" and a "deliberate purpose of injuring" may be elusive, it cannot be doubted that the Maryland legislature meant the latter to signify a more culpable level of intent. Cf. Mackall v. State, 387 A.2d 762, 765-66 (Md. 1978) (analyzing "legislative scheme" as manifested in "language and structure" of § 36). Frazier-El's comparatively short sentence could only imply that the aggravating factor of § 36(a)(2) was not found. But this conclusion provides no ground for inferring that the certified records relied upon

15

by the district court misstated the basis for his conviction under § 36(a)(1).

Finally, we note that in connection with the same conduct for which Frazier-El was convicted under § 36(a), he was also found guilty of both assault and theft, the sentences for which ran concurrently with the sentence for the § 36(a) violation. This assault conviction, coupled with the § 36(a) conviction, provides further evidence that Frazier-El's 1984 conviction had "as an element the use, attempted use, or threatened use of physical force against the person of another," 18 U.S.C. § 924(e)(2)(B)(i), or involved conduct that "presents a serious potential risk of physical injury to another," 18 U.S.C. § 924(e)(2)(B)(ii).

Notwithstanding the assault conviction, however, Frazier-El's § 36(a) conviction would still be a predicate offense for 18 U.S.C. § 924(e) because a § 36(a) violation requires not only the intent to carry a dangerous weapon but also the intent to injure another. See Anderson v. State, 614 A.2d 963, 969 (Md. 1992). Indeed, Maryland's enactment of § 36(a) was prompted by the recognition that such conduct presents a serious risk of injury, not only to a targeted victim, but also to unsuspecting members of the general public. See Anderson, 614 A.2d at 965. We therefore conclude that the district court did not err in sentencing Frazier-El as an armed career criminal under the sentence enhancement provisions of § 924(e).

For the reasons given, we affirm the judgment of the district court.

AFFIRMED

MURNAGHAN, Circuit Judge, dissenting:

The majority opinion correctly recites the constitutional standards governing the Sixth Amendment right to counsel and the correlative right under Faretta to waive counsel and proceed pro se. See Faretta v. California, 422 U.S. 806, 819 (1975) ("Although not stated in the [Sixth] Amendment in so many words, the right to self-representation -- to make one's own defense personally -- is . . . necessarily implied by the structure of the Amendment."). The majority also iden-

16

tifies the responsibilities incumbent upon defendants before undertaking self-representation. Defendants must execute a waiver of their Sixth Amendment right to counsel that is (1) clear and unequivocal, see Faretta, 422 U.S. at 835; (2) knowing, intelligent, and voluntary, see id.; see also Godinez v. Moran, 509 U.S. 389, 400-01 (1993); and (3) timely. See United States v. Lawrence, 605 F.2d 1321, 1325 n.2 (4th Cir. 1979).

While the majority articulates the constitutional framework accurately, its characterization of Frazier-El's attempted waiver of counsel is somewhat tenuous. As I read the record, the district court's denial of Frazier-El's request for self-representation rested on a fundamental misunderstanding of the "competency" a defendant must demonstrate before waiving counsel and proceeding pro se. Recognizing the futility of affirming on this fallible legal foundation, the majority creates a post hoc rationalization for the district court's ruling. The majority accomplishes this by redescribing the infirmity in Frazier-El's request, emphasizing not his incompetence but his failure to waive counsel in a "clear and unequivocal" fashion. At various points, the majority also engrafts a fourth "legitimacy" criterion onto Faretta's three-part framework, arguing that defendants must also have "legitimate" or "sincere" reasons for wanting to proceed pro se. This reformulation of the case is more conceptually sophisticated than the district court's approach. When applied to the facts of Frazier-El's case, however, the majority's modified analysis suffers from several difficulties.

I.

Frazier-El was profoundly dissatisfied with his court-appointed counsel, in part because his counsel refused to argue that the court lacked jurisdiction over Frazier-El as "an officer in the Moorish Science Temple." Frazier-El initially sought the appointment of new counsel, which the court denied. As a fallback, Frazier-El requested that the court permit him to proceed pro se. The court denied this request as well.

The threshold issue is determining why the district court denied Frazier-El's pro se request and whether a denial on that basis was appropriate. The court explained that it was denying the request

17

because Frazier-El's "Moorish national" argument represented an effort "to argue matters which would not be permitted by this court." The court continued: "I think Mr. Frazier-El is in a position where he is not competent because of arguments he has made to represent himself. However, this court is absolutely convinced that Mr. Frazier-El understands the nature of the proceedings and is able, if he so desires -- he is an intelligent man -- to assist in his own defense . . . ." (emphasis added).

The district court's conclusion reflects a misunderstanding of the "competence" defendants must demonstrate before undertaking self-representation. "Competency" in the waiver of counsel context is co-extensive with the "competency" necessary to stand trial. See Godinez, 509 U.S. at 399 (holding that a defendant who waives his right to counsel need not be "more competent than a defendant who does not, since there is no reason to believe that the decision to waive counsel requires an appreciably higher mental functioning . . . ."); see also Faretta, 422 U.S. at 835-36 (while a defendant choosing self-representation must do so "competently and intelligently," the defendant's "technical legal knowledge" is "not relevant" to determining whether he is competent to waive his right to counsel). "Competency" represents the minimal ability to understand the nature of the trial proceedings and to assist in one's own defense. See Godinez, 509 U.S. at 401 n.12 ("The focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the ability to understand the trial proceedings."). It is the threshold issue in every waiver of counsel case; for if the defendant is incapable of understanding the adversary proceeding in which he is involved, no trial is possible, much less a trial with the defendant conducting his own representation.

The district court, however, spoke of Frazier-El's lack of "competence" in the same sentence that it pronounced him capable of assisting in his own defense -- stating, in effect, that the defendant was not competent to proceed pro se even though he was competent to stand trial. In doing so, the court improperly applied a heightened standard of competency for waiver of counsel purposes, requiring defendants seeking pro se representation to demonstrate an extra measure of legal capacity exceeding the baseline standard for competency to stand trial.[1]

_____

[1] The Supreme Court has often spoken of the "knowing and intelligent" requirement as imposing a "heightened" standard on defendants seeking

18

The district court's conclusion is incorrect as a matter of law, given that the competency standards in the two contexts are symmetrical. See Faretta, 422 U.S. at 834 (rejecting judicial paternalism and holding that a court must respect a defendant's desire for self-representation as competent even when "he may conduct his own defense ultimately to his own detriment"); see also United States v. Arlt, 41 F.3d 516, 518 (9th Cir. 1994) ("[T]he Supreme Court's decision in Godinez explicitly forbids any attempt to measure a defendant's competency to waive the right to counsel by evaluating his ability to represent himself [in a tactical sense]."). The court effectively ratchetted up the standard for a valid waiver of the right to counsel, applying a heightened "competency" analysis that scrutinized Frazier-El's reasons for seeking pro se representation rather than his basic capacity to understand the trial proceedings and his rudimentary cognizance of what waiving counsel would entail.

To its credit, the majority opinion correctly notes that the district court, when denying Frazier-El's request for pro se representation, committed "an error of law" to the extent it based its denial on the feebleness of Frazier-El's proposed arguments and the legal "incompetence" these arguments allegedly reflected. Instead of reversing the district court's error, however, the majority provides a post hoc ratio-

_____

self-representation. See Godinez, 509 U.S. at 401. In Godinez, however, the court explained that the heightened standard created by the "knowing and intelligent" requirement "is not a heightened standard of competence." Id. Instead, it is a heightened standard of cognizance. See id. at 401 n.12 (holding that the "competency inquiry" focuses on "the defendant's mental capacity" and "ability to understand the proceedings," whereas the "knowing and voluntary" inquiry determines "whether the defendant actually does understand the significance and consequences of a particular decision and whether the decision is uncoerced").

The evidence suggests that Frazier-El did in fact understand the significance and consequences of waiving counsel and proceeding pro se, thereby satisfying the heightened "knowing and voluntary" requirement. Thus, even if the district court was confused about the proper nomenclature and accidentally conflated the "competency" inquiry and the "knowing and voluntary" inquiry, its denial of Frazier-El's request was still improper.

19

nalization for the court's denial of Frazier-El's request for self-representation. Recognizing that the district court's "competency" analysis is indefensible, the majority repackages the court's denial of Frazier-El's pro se request as resting on two different foundations: (1) Faretta's first requirement that waivers of the right to counsel be "clear and unequivocal," 422 U.S. at 835, and (2) a manufactured "fourth" requirement that defendants have sincere and legitimate reasons for seeking pro se representation. The majority's "clear and unequivocal" analysis is an attack on the form of Frazier-El's request. Its "sincere and legitimate" analysis is an attack on the reasons why Frazier-El sought pro se representation.

## II.

First, the form of Frazier-El's request. The majority contends that the district court denied Frazier-El's request for self-representation because Frazier-El repeatedly equivocated, vacillating between a desire for new appointed counsel, on one hand, and a desire to proceed pro se, on the other hand. Whether this accurately describes the district court's rationale is of course debatable, given that the court seemed more concerned with the kinds of arguments Frazier-El wanted to raise at trial than with the certitude of his desire to make them on his own behalf. Assuming for the moment that the court was indeed concerned about the clarity of Frazier-El's request for self-representation, there was nothing equivocal about what Frazier-El said. It is true that Frazier-El's request was a conditional one that he phrased "in the alternative," making it more nuanced than an orthodox waiver of counsel. Nevertheless, Frazier-El's request to represent himself was perfectly clear and intelligible. Each day people make countless requests in the alternative ("I'd like some coffee, but if you're out of coffee I'll take some tea"; "I'd prefer to see a movie, but if that's not possible, we can go to the museum instead"). Many languages even have a separate linguistic category called the subjunctive mood to express these sorts of contingent statements. Because such statements are "conditional . . . not equivocal," Adams v. Carroll, 875 F.2d 1441, 1445 (9th Cir. 1989), every other federal circuit to consider the question has come to the sensible conclusion that requesting self-representation as a "fallback" or "alternative" to a primary request for new appointed counsel does not automatically render the alternative request unclear or equivocal for purposes of Faretta.

20

See Adams, 875 F.2d at 1444-45 (conditional nature of request for self-representation does not make it equivocal or provide evidence of vacillation, in view of the "earnestness and frequency of [defendant's] requests to represent himself"); Johnstone v. Kelly, 808 F.2d 214, 216 n.2 (2d Cir. 1986) ("A request to proceed pro se is not equivocal merely because it is an alternative position, advanced as a fall-back to a primary request for different counsel.") (citations omitted); Williams v. Bartlett, 44 F.3d 95, 100 (2d Cir. 1994) ("[A] defendant is not deemed to have equivocated in his desire for self-representation merely because he expresses that view in the alternative [and] simultaneously requests the appointment of new counsel . . . ."); and United States v. Baker, 84 F.3d 1263, 1264 (10th Cir. 1996) (rejecting government's argument that defendant did not make clear and unequivocal request; request for advisory counsel did not diminish right to self-representation).

While the majority does not embrace the common sense position that prevails in other federal circuits, I do not read its opinion as creating a categorical rule that every request stated in the alternative is presumptively an equivocal one. Instead, the majority implies that courts must look to the policies underlying the "clear and unequivocal" requirement to determine whether a particular request for self-representation complies with Faretta. Thus, on the majority's theory, not every request stated in the alternative violates the "clear and unequivocal" requirement -- only that sub-set of requests stated in the alternative violating the policies the requirement embodies.

III.

The majority seems to have three different theories about why pro se requests stated in the alternative violate the "clear and unequivocal" requirement, vitiating a defendant's request for self-representation: (1) conditional requests increase the risk of an inadvertent waiver of the right to counsel; (2) conditional requests are often a manipulative tactic for delay, disruption, and distortion of the system; and (3) conditional requests are often a strategic ploy to create grounds for reversible error on appeal.

First, the majority argues that a request stated in the alternative may increase the risk of "an inadvertent waiver of the right to counsel

21

by a defendant's `occasional musings on the benefits of self-representation.'" Arlt, 41 F.3d at 519 (quoting Adams, 875 F.2d at 1444). In the instant case, however, Frazier-El's request for self-representation reflected a deep-seated, persistently held conviction, not an "occasional musing" on the benefits of proceeding pro se. In separate pretrial proceedings spread out over the course of a year, Frazier-El repeatedly told the court that he wanted to represent himself. At the initial hearing regarding his competency to stand trial, Frazier-El told the court several times that he wanted to dismiss his lawyer and represent himself. Frazier-El reasserted his right to self-representation at the second competency hearing when he sought to discharge his counsel, Mr. Risberg. Finally, before the start of the pretrial motions hearing, Frazier-El again sought to represent himself and repeatedly responded "yes" when the court asked him if that was his desire. Thus the concerns raised in Arlt (amorphous gestures toward self-representation leading to an inadvertent waiver of the right to counsel) are simply not present in the instant case. If there is an infirmity in Frazier-El's request, it must therefore lie elsewhere.

The majority's second theory is that pro se requests stated in the alternative are not "clear and unequivocal" when they are a device for delay, disruption, and distortion of the system. See majority op. at 8. A defendant's duplicitous motivations for stating a pro se request, however, have nothing to do with the request's clarity and unequivocality. I suspect the majority would counter that a pro se request engendered by ulterior motives (such as the desire to delay, disrupt, or distort) is not "clear and unequivocal" in the sense that it is tainted with an agenda, rather than being a pure, unalloyed request. This is a creative gloss on the "clear and unequivocal" requirement. What the majority is really doing, however, is grafting a fourth "sincerity," or "legitimacy," criterion onto the trilogy of factors governing waiver of the right to counsel under Faretta. See majority op. at 10 ("A trial court must be permitted to distinguish between a manipulative effort to present particular arguments and a sincere desire to dispense with the benefits of counsel.") (emphasis added).

The questionable pedigree of the majority's "sincerity" thesis is best illustrated by the cases the majority cites in support of it. One of the cases has nothing to do with waiver of the right to counsel at all. The two others are factually distinguishable from the instant case. For

22

example, the majority cites United States v. Lawrence, 605 F.2d 1321, 1324-25 (4th Cir. 1979), as authority for its claim that alternative requests for self-representation are invalid when used as a tactic for "delay." Lawrence did raise concerns about the tendency of self-representation requests to delay trial proceedings; but the court discussed the issue under the rubric of the "timeliness" requirement, asking whether courts should honor requests by the defendant to waive counsel and proceed pro se after the trial has commenced. The Lawrence court held that the "timeliness" requirement is designed to strike a balance between the defendant's right to self-representation and the system's interest in minimizing disruptions, avoiding inconvenience and delay, and maintaining the continuity of the trial. Id. Lawrence is therefore a case about late, untimely requests to proceed pro se, not about pro se requests stated in the alternative. Consequently, it is a red herring in the majority's analysis. Moreover, what little relevance Lawrence possesses clearly redounds to Frazier-El's benefit, given that the defendant in Lawrence requested self-representation only after a year of repeated pretrial court appearances, see id. at 1325, whereas Frazier-El stated his request from the outset of the pretrial proceedings.

Equally misleading is the majority's reference to United States v. Singleton, 107 F.3d 1091 (4th Cir. 1997), for the proposition that pro se requests stated in the alternative are impermissible when they are an "instrument to distort the system." Id . at 1102. Like Lawrence, Singleton was not a case about a pro se request stated in the alternative. Instead, it involved a request by a defendant to represent himself in certain spheres of the trial while enjoying the benefits of appointed counsel in others. In the instant case, Frazier-El wanted either a new counsel or to represent himself. The defendant in Singleton, however, wanted both simultaneously -- an "intermediate accommodation" that involved "selectively employ[ing] his attorney while making his own defense." Id. The "distortion" of the system that Singleton addressed therefore arose from a scenario entirely distinguishable from Frazier-El's conditional request for self-representation. The majority's effort to export Singleton's "distortion" rationale to the instant case is therefore unavailing.

Most problematic is the majority's misleading citation to footnote 46 of Faretta for the proposition that defendants should not use con-

23

ditional pro se requests as a tactic for "disruption of the system." 422 U.S. at 834 n.46. Footnote 46 has nothing to do with conditional pro se requests. Indeed, it has nothing to do with the propriety of any type of pro se request. Instead, footnote 46's "disruption" concerns focus on problems that may arise after a court has already granted a pro se request, and a defendant who is untrained in the rituals and conventions of legal argumentation represents himself without the normalizing influence of a lawyer. Footnote 46 of Faretta empowers courts to deal with potential disruptions and irregularities by preventing pro se defendants from making a travesty of the court proceedings. Footnote 46, however, says nothing about whether a defendant's disruptive motivations for making a pro se request constitute a legitimate basis for denying it.**2**

_____

**2** The majority also relies on Martinez v. Court of Appeals of Cal., 120 S. Ct. 684 (2000), for the proposition that trial courts have a general, overarching interest in "ensuring the integrity and efficiency of the trial," which often "outweighs the defendant's interest in acting as his own lawyer." Id. at 691. Martinez, however, is distinguishable. In that case, the question before the Court was whether the logic of Faretta, which recognized a Sixth Amendment right to represent oneself at trial, also confers an analogous Sixth Amendment right to represent oneself during appellate proceedings. See id. at 687 ("Our conclusion in Faretta extended only to a defendant's constitutional right to conduct his own defense. Accordingly, our specific holding was confined to the right to defend oneself at trial. We now address the different question whether the reasoning in support of that holding also applies when the defendant becomes an appellant and assumes the burden of persuading a reviewing court that the conviction should be reversed."). Because the Sixth Amendment "does not apply to appellate proceedings," id. at 690, the Court held that "any individual right to self-representation on appeal based on autonomy principles must be grounded in the Due Process Clause." Id.

In the course of its due process inquiry, the Court observed, in dicta, that "the right to self-representation is not absolute . . . [e]ven at the trial level . . . ." Id. at 691. The Court then enumerated the various limits on the Sixth Amendment pro se right recognized in Faretta. For example, the defendant's request for self-representation must be "voluntary and intelligent" and "timely." The trial judge "may also terminate self-representation or appoint `standby counsel' -- even over the defendant's objection -- if necessary." Id. Standby counsel may also participate in

24

In short, the majority derives its second theory (the sincerity-based "delay, disruption, and distortion" argument) from inapposite case law. Notwithstanding the fact that a defendant's motivation for seeking self representation is irrelevant under the trilogy of factors governing waiver of the right to counsel, the three cases the majority cites to support its "sincerity" thesis have nothing to do with the defendant's sincerity at all. The defendant in <u>Lawrence</u> lost because his <u>pro se</u> request was belated, not because it was insincere. The defendant in <u>Singleton</u> lost because he sought an impermissible middle ground between self-representation and representation by counsel. The problem was <u>what</u> he wanted, not <u>why</u> he wanted it. <u>Faretta</u> is the farthest afield because it has nothing to do with requests for self-representation at all, much less the sincerity with which defendants make such requests.

Even if it had stronger moorings in relevant decisional authority, the "sincerity" thesis is a weak basis for attacking Frazier-El's

_____

the trial proceeding, even without the express consent of the defendant, as long as the participation does not seriously undermine the appearance before the jury that the defendant is representing himself. <u>See id</u>. (citing <u>McKaskle v. Wiggins</u>, 465 U.S. 168, 187 (1984)). Finally, the trial judge is under no obligation to provide instruction to the <u>pro se</u> defendant on courtroom procedure or to perform any "legal`chores' for the defendant that counsel would normally carry out." <u>Martinez</u>, 120 S. Ct. at 691 (citing <u>McKaskle</u>, 465 U.S. at 183-84).

These various limits on the <u>pro se</u> right, the <u>Martinez</u> Court explained, reflect the "government's interest in ensuring the integrity and efficiency of the trial," which will "at times outweigh the defendant's interest in acting as his own lawyer." <u>Id</u>. at 691. The"integrity and efficiency" rationale, however, does not endow trial courts with the power to scrutinize the "sincerity" or "legitimacy" or a <u>pro se</u> request, as the majority claims. The only <u>ex ante</u> limit on <u>pro se</u> requests is that they be clear and unequivocal; knowing and voluntary; and timely. All the other limits (appointment of standby counsel and termination of self-representation once commenced) are <u>ex post</u> restrictions. The majority's reliance on <u>Martinez</u> is therefore misplaced. The ultimate holding of <u>Martinez</u> addressed the <u>pro se</u> right in an appellate, rather than a trial, setting. And the Court's dicta regarding the "integrity and efficiency" restriction on the <u>pro se</u> right in the trial context does not authorize judicial interrogation into the "sincerity" or "legitimacy" of a <u>pro se</u> request.

25

request, which arose not from dilatory or disruptive stratagems but from a sincere desire to conduct his own defense in the event the court would not grant him new appointed counsel. The argument that Frazier-El sought to advance on his behalf (that the court lacked jurisdiction over him as a Moorish national) was indeed a frivolous one. But Faretta makes abundantly clear that, while pro se defendants must practice basic decorum while conducting their defense, the tenuousness of their arguments is not a basis for denying them the right to self-representation. See id. at 834, 836.

IV.

Even though the majority's analytical detour through the "sincerity" thesis is a dead end, the majority has yet another theory as to why conditional requests for self-representation amount to an insufficient waiver of the right to counsel. According to the majority, defendants like Frazier-El often request pro se representation in the alternative for the express purpose of creating reversible error on appeal. The strategy the majority imputes to defendants like Frazier-El involves the defendant's creation of a Catch-22, forcing the court to "`traverse . . . a thin line' between improperly allowing the defendant to proceed pro se, thereby violating his right to counsel, and improperly having the defendant proceed without counsel, thereby violating his right to self-representation." Fields v. Murray, 49 F.3d 1024, 1029 (4th Cir. 1995) (quoting Cross v. United States, 893 F.2d 1287, 1290 (11th Cir. 1990)). Because the denial of the right to self-representation is a structural defect never amenable to harmless error analysis, see McKaskle v. Wiggins, 465 U.S. 168, 177 n.8 (1984), and Arizona v. Fulminante, 499 U.S. 279, 310 (1991), the majority is concerned that artful criminal defendants will manipulate the "mutual exclusivity of the rights to counsel and self-representation," Fields, 49 F.3d at 1029, for the deliberate purpose of creating reversible error on review. See majority op. at 8.

Unlike the "sincerity" thesis, the "reversible error" scenario discussed in Fields at least has a firmer doctrinal grounding in Faretta's "clear and unequivocal" requirement. See Fields, 49 F.3d at 1029 (describing the "reversible error" scenario as one of the problems the "clear and unequivocal" requirement helps to combat). Fields, however, is distinguishable from the instant case. To begin with, the "re-

26

versible error" language in Fields is dicta. The Fields court denied the defendant's request for pro se representation not because it was a plot to create reversible error but because the defendant only requested self-representation once over the course of three letters to the court and several subsequent hearings. The single request he tendered, moreover, was a tentative one, qualified by a comment that he "re-gret[ted] taking this action" and was "reluctan[t]" even to act as co-counsel "since [his] knowledge of the law[was] limited." Id. at 1033. By contrast, Frazier-El requested self-representation on multiple occasions, beginning at the outset of the pretrial proceedings. At no time did he express any reservations about his ability or his desire to proceed pro se, in the event the court was unwilling to grant his primary request to have newly appointed counsel.

The defendant in Fields, furthermore, was not genuinely interested in conducting his entire defense on his own. All he really wanted was the opportunity to participate in one discrete area of the trial: the cross-examination of the children he was accused of assaulting. Id. at 1034. In this sense, his request to proceed pro se was really just a pre-text for a different agenda. Because the court held that the defendant had no right to cross-examine the children personally, it denied his request for self-representation, given that his pro se motion was para-sitic on his desire to engage in the forbidden cross-examination. Id.

In short, Fields' discussion of the "reversible error" scenario was not essential to its holding. Interestingly, however, Fields lends some credence to a variant of the majority's "sincerity" thesis, even though the majority does not seem to recognize this and fails to develop its implications. The Fields court held that a request to proceed pro se must, at a minimum, be clear and unequivocal, knowing and volun-tary, and timely. Yet a pro se request could still fail, the court held, if the defendant's underlying reasons for seeking self-representation were illegitimate. Id. at 1034. In the instant case, the majority makes a similar argument when holding that the district court's finding regarding Frazier-El's "incompetence" referred only to "the legitimacy of the request and the arguments advanced, rather than to Frazier-El's ability to make a knowing election of self-representation and waiver of counsel." See majority op. at 11 (emphasis added). The suggestion is that Faretta's three-part waiver of counsel framework may implicitly include a fourth "legitimacy" criterion. This argument,

27

however, is question-begging. It provides no criteria for distinguishing legitimate from illegitimate reasons for seeking self-representation. And it leaves unanswered the toughest question: namely, how to reconcile the intuition that certain reasons for seeking self-representation are improper with the unmistakable command of Faretta, which held that courts should not be in the business of paternalistically second-guessing the wisdom of a defendant's desire to proceed pro se, "even where the defendant may ultimate conduct his defense to his own detriment." 422 U.S. at 834.

Frazier-El's Moorish national argument is clearly a non-starter in terms of trial strategy. Nevertheless, as the report on Frazier-El's competency suggested, Frazier-El's argument "is loosely based on the doctrine of the Moorish Science Temple of America, a recognized organization in the United States." While Frazier-El had "exaggerated" the doctrine for his own benefit, the competency report concluded that the argument was not delusional and was grounded in an established set of religious creeds. Unlike in Fields, where the court had a compelling reason for denying the defendant's request to cross-examine the children he allegedly assaulted, there is no comparable reason for denying Frazier-El the opportunity to make his Moorish national argument simply because it strikes more enlightened judicial minds as utter absurdity.

To focus the inquiry, however, I suggest that this court need not reach the issue of whether Frazier-El's reasons for wanting to proceed pro se are analogous to, or distinguishable from, the situation in Fields. And we certainly need not reach the even thornier antecedent issue of why some reasons for seeking pro se representation are legitimate and others are not. Sidestepping these difficult conceptual issues is possible because there is a narrower, more straightforward basis for granting Frazier-El's pro se request. Even if the Moorish national argument is improper, Frazier-El made clear that this was not the only argument he would have advanced during the course of his contemplated self-representation. Unlike the defendant in Fields, who conceded "that he desired to proceed pro se for only one purpose," id. at 1034, Frazier-El let the court know that his Moorish national argument was merely "one of the issues" he would raise at trial. See majority op. at 4-6. In light of this statement, it was the judge's responsibility to ask more thorough follow-up questions to determine

28

what else Frazier-El would be arguing during his self-representation. Instead, the judge (or, more precisely, the majority standing in as a surrogate for the judge) glibly presumed that Frazier-El's request for self-representation was nothing more than "a manipulative effort to assert the [Moorish national] defenses himself." The tenuous quality of his Moorish national argument, however, was an improper basis for denying Frazier-El's request for self-representation, given that he was planning to make other arguments and had other reasons for wanting to proceed pro se, unlike the defendant in Fields.

V.

There is one final issue worth revisiting, and it deals with the majority's argument that Frazier-El was surreptitiously trying to create reversible error by phrasing his request in the alternative. I argued in the prior section that the "reversible error" scenario in Fields was dicta. Even if it was not dicta, however, there are better ways to deal with the "reversible error" problem than by creating a judicial rule, ex ante, that all pro se requests stated in the alternative are presumptively disfavored. Indeed, it is possible to combat the "reversible error" scenario in a way that both respects a defendant's Faretta right to self-representation and guards against its abuse. The Ninth Circuit's opinion in Adams v. Carroll is instructive. Holding that the conditional nature of a defendant's request for self-representation does not make it equivocal, the court explained:

> This conclusion is reinforced when tested against the purposes underlying the unequivocality requirement. Adams was not seeking to waive his right to counsel in a thoughtless manner; the trial court engaged him in extensive discussion regarding the difficulties of proceeding in pro per. Adams nevertheless persisted, choosing to fend for himself rather than rely on counsel whom he mistrusted. Nor was his request a momentary caprice or the result of thinking out loud; he made the same request over and over again, at nearly every opportunity. Had the request been granted, an appeal based on the denial of the assistance of counsel would have been frivolous, in light of the earnestness and frequency of his requests to represent himself. None of the purposes served by the requirement would be furthered by

29

> treating a conditional request for self-representation as equivocal.

Id. at 1445.

I also note the significance of the immediately preceding passage. Right before concluding that the defendant's conditional pro se request was in fact "clear and unequivocal," the Adams court raised concerns about defendants concocting a "reversible error" scenario by phrasing their pro se requests in the alternative -- the exact issue so worrisome to the majority. In fact, the language from Fields v. Murray that the majority cites to underscore its"reversible error" concerns is lifted verbatim from Adams, which was decided six years earlier. In effect, the majority selectively borrows language from Adams that helps it rule against Frazier-El but conveniently ignores the ultimate holding of Adams, which undeniably inures to Frazier-El's benefit -- given the obvious parallels between the nature of the conditional pro se requests made by the defendants in the two cases.

Had the majority read Adams holistically, rather than in a piece-meal fashion, it would have seen that the case offers some simple antidotes to the "reversible error" Pandora's Box that the majority is reluctant to open. First, Adams suggests that the district court must conduct a thorough and careful colloquy with the defendant to pin down precisely what the defendant's wishes are. If a defendant is making ambiguous gestures toward self-representation, the court must confront the defendant and force him to make a more exacting statement, ensuring that the defendant understands precisely what his rights are along with the serious consequences of waiving counsel. There is no reason that a conditional pro se request should send the district court into analytical disorientation. Rather than flatly denying a request for self-representation because the form of the request is a conditional one, the court should simply frame the conditional request in clear terms and make the defendant acknowledge on the record that the court has properly understood the request. For example, the court should say something to the defendant such as: "You want new counsel; but if I deny you that, you then want to represent yourself. Is that correct? And you understand that if I deny your request for new counsel and grant your fallback request for self-representation, you thereby waive your right to counsel and cannot later come back and say that

30

my decision to grant you self-representation was a denial of your right to counsel. Do you understand that? If so, do you still want to represent yourself?"

Forcing defendants to articulate their position in such precise terms is one step toward combating the "reversible error" scenario. The second step is even simpler. As long as the district court elicits the precise contours of a defendant's request, appellate courts will not countenance arguments by defendants on appeal that the district court improperly allowed them to proceed pro se. The district court need not worry about clever defendants manipulating them into "reversible error" as long as the district court does a sufficient job of engaging the defendant on the record. See Bartlett, 44 F.3d at 100 ("The entire procedure requires not only an intricate assessment of the defendant's intent, knowledge, and capacity, but a strong measure of patience as well.") (internal quotations omitted). It is no doubt easier when the defendant makes a simple request to proceed pro se, uncluttered by conditions and fallback scenarios. By trying to make things easier on the district court, however, the majority dangerously erodes defendants' fundamental Faretta rights by requiring, it seems, "a Zen-like persistence in uttering a single mantra," Fields, 49 F.3d at 1044 (Ervin, J., dissenting), and the "ability to spout crisp legalese," id., before a court will grant a request for self-representation.

VI.

While the majority pays nominal deference to the pro se right recognized in Faretta, the unmistakable subtext of its opinion is that the right is a nuisance and a constitutional anachronism that courts should curtail whenever possible. For example, the majority cites Martinez for the proposition that, "with the increased availability of competent counsel, the historical reasons for recognizing the right do not have the same force." See majority op. at 10.

The original historical justification for the pro se right, however, is but one source of its constitutional legitimacy. Equally important to the Faretta court was the insight that the self-representation right grows out of "that respect for the individual which is the lifeblood of the law." 422 U.S. at 834 (internal quotations omitted). "An unwanted counsel `represents' the defendant only through a tenuous and unac-

31

ceptable legal fiction," id. at 821, because it is ultimately the "defendant, and not his lawyer or the State, [who] will bear the personal consequences of a conviction." Id. at 834.

Unlike the antiquated historical argument for self-representation, Faretta's "autonomy" rationale is as compelling today as it was centuries ago and is undiminished by the ready availability of competent counsel in modern times. The Martinez Court recognized as much, holding that "an individual's decision to represent himself is no longer compelled by the necessity of choosing self-representation over incompetent or nonexistent representation; rather, it more likely reflects a genuine desire to `conduct his own cause in his own words.'" Martinez, 120 S. Ct. at 689 (quoting Faretta, 422 U.S. at 823).

To be sure, the pro se right is not without limits. Appellate courts are not free, however, to superimpose additional layers of restrictions that reduce the availability of the pro se right. The majority's decision to do so suggests that it is less concerned with analytical and doctrinal integrity than with surreptitiously eroding a disfavored constitutional right.

I respectfully dissent.