614 A.2d 963

**Elmer ANDERSON, Jr.**

v.

**STATE of Maryland.**

**No. 157, Sept. Term, 1991.**

Court of Appeals of Maryland.

Nov. 10, 1992.

428

John L. Kopolow, Asst. Public Defender (Stephen E. Harris, Public Defender, both on brief) Baltimore, for petitioner.

Diane E. Keller, Asst. Atty. Gen. (J. Joseph Curran, Jr., both on brief) Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

RODOWSKY, Judge.

Maryland Code (1957, 1992 Repl.Vol.), Art. 27, § 36 makes criminal, *inter alia*, the carrying, concealed upon or about one's person, of certain specified weapons and also of "any other dangerous or deadly weapon of any kind." There are many objects, not specified in § 36, which an individual could carry in a concealed fashion and which have the potential for use as a weapon. Here, we deal specifically with a utility knife, an object which is designed to be used as a tool, but which could be used as a weapon. The State contends that the statute is violated by the concealed carrying of a utility knife, with no intent required other than to carry the object while it is concealed. The accused contends that the statute is not violated unless the object is carried, concealed, with the purpose of having the object

available for its use as a weapon. As we explain below, we agree with the construction advocated by the accused.

The legal issue arises out of the following facts. On May 26, 1990, at approximately 12:45 a.m., Officer Kyle Starghill (Starghill) and another officer of the Anne Arundel County Police Department were on patrol in a marked vehicle. Starghill observed the petitioner, Elmer Anderson, Jr. (Anderson), talking to the occupants of a black Nissan 300ZX in the area of the eighty-five hundred block of Pioneer Drive in the Pioneer City–Warfield condominium community of Severn. Starghill characterized that block of Pioneer Drive as an "open air drug market."

As Starghill approached, the Nissan drove off and Anderson began walking away. Viewing the situation as suspicious, Starghill stopped the patrol car, alighted, and called to Anderson who stopped, turned, and walked back to Starghill.

Starghill asked for identification, and Anderson produced his driver's license. When asked what he was doing Anderson said he was on his way to a specific food market which Starghill knew had closed at 11:00 p.m. Starghill asked Anderson if he possessed any crack cocaine. Anderson replied that he did not possess any crack cocaine. At trial Starghill explained why he had asked that question.

"Well, we were in the area of an open-air drug market and I frequently in that area, working that ... the hours that I was working on that particular evening were, I believe, 1900 hours to 0300 hours in the morning.... The reason for that is because that's high activity time in that community for drug dealing. Generally the ... the suspected drug dealer will approach vehicles on Pioneer Drive and make the transaction or the sale through the window ... and the vehicle will speed off."

Starghill inquired if Anderson would consent to a search of his person. He consented. Starghill asked whether Anderson possessed "any type of weapon or a knife or anything." Anderson took from his back pants pocket and

handed Starghill what was called at trial a "razor knife"—a type of utility knife.[1] In addition, a piece of soap, approximately one inch by one inch by one-half inch, and three small glassine baggies were recovered from Anderson's front pocket.

Anderson told Starghill that he used the knife on his job, and that he intended to use the soap to take a bath. He never told Starghill the type of job on which he used the knife. Anderson had no response when asked his intended use of the glassine baggies.

By information, the State charged Anderson with possessing a noncontrolled substance, intending to distribute it as cocaine, and with the unlawful wearing and carrying of a "razor knife, a dangerous or deadly weapon, concealed upon and about [his] person," contrary to § 36.[2]

---

1. The blade of the subject utility knife is enclosed in a plastic case approximately six inches long. The blade is exposed by removing a plastic cap from one end of the case and then pushing a lever to slide the blade to an exposed position at the open end. Fully extended the blade measures three inches in length. It is three-eighths of an inch wide. Its cutting edge is on one side only. The blade is notched diagonally at three-sixteenths of an inch intervals, creating twelve sections. The blade is designed to be exposed in small increments, allowing a notched section to be broken off when it dulls. The knife can be used to cut wallcovering, dry wall, tape, string, roofing or almost any type of soft material. *See* T. Philbin & S. Ettling, *The Complete Illustrated Guide to Everything Sold in Hardware Stores* 22 (1988). Officer Starghill testified that the plastic cap was on the knife when he took it from Anderson.

2. Section 36, in relevant part, provides:
 "**§ 36. Carrying or wearing concealed weapon; carrying openly with intent to injure; carrying by person under eighteen at night in certain counties.**
 (a) *In general.*—Every person who shall wear or carry any dirk knife, bowie knife, switchblade knife, star knife, sandclub, metal knuckles, razor, nunchaku, or any other dangerous or deadly weapon of any kind, whatsoever (penknives without switchblade and handguns, excepted) concealed upon or about his person, and every person who shall wear or carry any such weapon, chemical mace or tear gas device openly with the intent or purpose of injuring any person in any unlawful manner, shall be guilty of a misdemeanor, and upon conviction, shall be fined not more than $1,000 or be imprisoned in jail, or sentenced to the Maryland Department of

In a nonjury trial the circuit judge found Anderson guilty of the weapons charge but, giving him the benefit of the doubt, acquitted Anderson of the other charge. It appears from colloquy between court and counsel that the circuit judge equated the razor knife charged in the information with a "razor," the concealed carrying of which is specifically proscribed by § 36(a). The circuit court apparently rejected the argument of defense counsel who contended that the "razor," specifically referred to in § 36(a), meant a straight razor. Were "razor" read otherwise, counsel submitted, any person who carried newly purchased razor blades home from the store would commit the offense.

The court imposed a one year sentence, suspended it, and ordered Anderson to serve a two year term of probation. Anderson appealed to the Court of Special Appeals, which affirmed in an unreported opinion.

That court reasoned that the General Assembly had imposed "a special *mens rea* on the open carrying of weapons but deliberately did not impose such a special *mens rea* on the act of carrying concealed dangerous and deadly weapons." The intermediate appellate court cited, as cases in this Court recognizing that distinction, *Mackall v. State*, 283 Md. 100, 106, 387 A.2d 762, 765 (1978) and *Hoey v.*

---

Correction for not more than three years; and in case of conviction, if it shall appear from the evidence that such weapon was carried, concealed or openly, with the deliberate purpose of injuring the person or destroying the life of another, the court shall impose the highest sentence of imprisonment prescribed....

　　(b) *'Star knife' defined.—* ...

　　(c) *'Nunchaku' defined.—* ...

　　(d) *Exceptions.*—Nothing in this section shall be construed to prevent the carrying of any of the weapons mentioned in subsection (a) of this section by an officer of this State ... or by any person to whom a permit to carry a concealed weapon has been issued under § 36E of this article, or by any person who shall carry such weapon as a reasonable precaution against apprehended danger, but the tribunal before which any case arising under the provisions of this section may be tried, shall have the right to judge of the reasonableness of the carrying of any such weapon, and the proper occasion therefor, under the evidence in the case."

*State,* 311 Md. 473, 493, 536 A.2d 622, 632 (1988). We granted Anderson's petition for certiorari.

Criminal statutes dealing with concealed weapons serve two related purposes. First, they seek to protect the public by deterring persons from concealing on or about their persons weapons of which the public would be unaware, thereby preventing injury or death to unsuspecting members of the public. *See* Annotation, *Offense of carrying concealed weapon as affected by manner of carrying or place of concealment,* 43 A.L.R.2d 492, 495 (1955); Note, *Criminal Law—The Law as to Concealed Deadly Weapons,* 43 Ky. L.J. 523, 524 (1955). Second, these statutes protect the wearers or carriers of weapons from themselves, by attempting to deter persons from having at hand weapons that could be used in the heat of passion. *See* Annotation, *supra,* at 496–97; *see also Sutton v. State,* 12 Fla. 135, 137 (1867) ("[M]en in vexed assemblies or in public meetings, conscious of their advantage in possessing a secret and deadly weapon, often become insulting and overbearing in their intercourse, provoking a retort or an assault, which may be considered as an excuse for using the weapon, and a deadly encounter results, which might be avoided where the parties stand on a perfect equality, and where no undue advantage is taken.").

The Maryland statute, now § 36, originated with Chapter 375 of the Acts of 1886. That enactment punished a person
> "who shall wear or carry any pistol, dirk-knife, bowie-knife, slung-shot, billy, sand-club, metal knuckles, razor, or any other dangerous or deadly weapon of any kind whatsoever, (penknives excepted,) concealed upon or about his person; and every person who shall carry or wear any such weapon openly, with the intent or purpose of injuring any person."

This 1886 reference to a "razor" is to a straight razor.

The Maryland statute has been amended many times, the first of which was in 1894. The preamble to the 1894 amendment stated:

"WHEREAS, It is represented to this General Assembly that the existing law in reference to the offense of carrying concealed weapons does not make proper discrimination in favor of those who travel in dangerous localities, or from other imminent necessity, or prudent precaution in the presence of threatened injury to their lives or persons, may reasonably arm themselves for self-protection; and the law has been made an instrument of injustice to those not deserving of punishment...."

Acts of 1894, ch. 547. Accordingly, those who carried weapons "as a reasonable precaution against apprehended danger" were excepted by the 1894 amendments. *Id.; see* Art. 27, § 36(d). The court or jury decides the reasonableness of carrying a weapon "under the evidence in the case." *See id.*

Writing during this period, Lewis Hochheimer described statutes criminalizing the carrying of concealed weapons. Speaking generally, and not with particular reference to the Maryland statute, he said that "[g]uilt ordinarily attaches, whenever one does the prohibited act, regardless of any question of specific evil intent or wrongful motive." L. Hochheimer, *Crimes and Criminal Procedure* ch. 44, § 281, at 314 (2d ed.1904) (footnote omitted). All of the cases cited by Hochheimer in his supporting footnote involve the concealed carrying of a handgun.[3] Handguns were specifically listed as weapons in the Maryland statute until the enactment of the Maryland Handgun Act by Chapter 13 of the Acts of 1972. *See* Md.Code (1957, 1992 Repl. Vol., 1992 Cum.Supp.), Art. 27, §§ 36B–36K.

 The legal significance of listing certain specified objects in § 36(a) was explained in *Mackall v. State,* 283 Md. 100, 387 A.2d 762 (1978). There we held that the State

---

3. Hochheimer cites *State v. Dixon,* 114 N.C. 850, 19 S.E. 364 (1894); *Strahan v. State,* 68 Miss. 347, 8 So. 844 (1891); *Goldsmith v. State,* 99 Ga. 253, 25 S.E. 624 (1896); *Walls v. State,* 7 Blackf. 572 (Ind.1845); *Cutsinger v. Commonwealth,* 70 Ky. (7 Bush) 392 (1870); *Preston v. State,* 63 Ala. 127 (1879); and *Carroll v. State,* 28 Ark. 99 (1872).

had the burden of proving a knife was not within the statute's penknife exception. 283 Md. at 111, 387 A.2d at 768. In reaching that conclusion we stated:

"Generally, it is a misdemeanor for any person to carry any dangerous or deadly weapon ... concealed.... The following articles are dangerous and deadly weapons *per se*: a) dirk knives; b) bowie knives; c) switchblade knives; d) sandclubs; e) metal knuckles; f) razors; g) nunchakus."

*Id.* at 106, 387 A.2d at 765.[4] For objects not legislatively classified as dangerous and deadly *per se*, such as the utility knife involved here, the State must prove that the object is within the class described as "any other dangerous or deadly weapon of any kind." Art. 27, § 36; *see Mackall*, 283 Md. at 108–11, 387 A.2d at 766–68; *Brooks v. State*, 314 Md. 585, 599–601, 552 A.2d 872, 879–80 (1989).

This Court has discussed whether an object that is not, *per se*, a dangerous and deadly weapon, should be considered to be such. The issue arises in the context of § 36, and in the context of the aggravated robbery statute, Art. 27, § 488.[5]

*Savoy v. State*, 236 Md. 36, 39, 202 A.2d 324, 326 (1964), involved a gravity knife, described as similar to a switchblade knife, which "could be locked in position ... with a flick of the wrist." This Court concluded that "the question

---

4. In 1985, "star knives" were added to the statutory list that *Mackall* considered to be "dangerous and deadly weapons *per se.*" Acts 1985, ch. 591; *see Mackall*, 283 Md. at 106, 387 A.2d at 765.

5. Article 27, § 488, provides in pertinent part:
 "Every person convicted of the crime of robbery ... with a dangerous or deadly weapon or accessory thereto, shall ... be sentenced to imprisonment in the Maryland Penitentiary for not more than twenty years."
 In *Brooks v. State,* 314 Md. 585, 599, 552 A.2d 872, 879–80 (1989), we recognized that the "dangerous or deadly weapon" language in § 488 came from the predecessor statute to § 36. Moreover, in numerous concealed weapon cases we have cited approvingly to cases that have determined what constitutes a "dangerous or deadly weapon" in the context of the aggravated robbery statute. *See, e.g., Mackall,* 283 Md. at 108, 111, 387 A.2d at 766, 768.

whether the knife constituted a dangerous or deadly weapon was properly submitted to the jury" in a § 36 prosecution. *Id.* at 39, 202 A.2d at 326.

Violation of the aggravated robbery statute was charged in *Bennett & Flynn v. State,* 237 Md. 212, 205 A.2d 393 (1964). We held that use of the microphone cord from a taxicab's two-way radio to strangle the cab driver during a robbery sufficed to support a finding that the cord was a "dangerous or deadly weapon." *Id.* at 215–16, 205 A.2d at 394–95. Quoting approvingly from *Wharton's,* we said:

"The character of a weapon as a deadly or dangerous weapon is not necessarily determined by its design, construction, or purpose. A weapon may be deadly or dangerous although not especially designed or constructed for offensive or defensive purposes or for the destruction of life or the infliction of bodily injury. Accordingly, when a weapon is in fact used in such a way as is likely to produce death or grievous bodily harm it may be properly regarded as a dangerous or deadly weapon."

*Id.* at 215, 205 A.2d at 394 (quoting 3 *Wharton's Criminal Law & Procedure* § 961, at 113 (Anderson's ed.1957)).

*Hoey v. State,* 311 Md. 473, 536 A.2d 622 (1988), briefly discusses § 36, in reference to the burden of proof of lack of criminal responsibility. We reviewed the Molotov cocktail statute, Art. 27, § 139A, together with the concealed weapons statute, stating:

"For the State to prove a violation of [§ 139A], 'it is necessary to show mere possession of the specified object, regardless of the purposes for which it may subsequently be used.' Similarly, to prove that a defendant was guilty of wearing or carrying a concealed dangerous or deadly weapon under Art. 27, § 36, it is only necessary for the State to show that the defendant 'carried a dangerous or deadly *weapon* "concealed upon or about his person." ' "

*Id.* at 493, 536 A.2d at 632 (emphasis added; citations omitted).

A toy plastic pistol was the weapon used in *Brooks v. State*, 314 Md. 585, 552 A.2d 872 (1989), an aggravated robbery prosecution. Synthesizing prior decisions, we adopted an objective standard when determining whether an instrument is a "dangerous or deadly weapon" under § 488. We said that the instrument must be:

"(1) designed as ' "anything used or designed to be used in destroying, defeating, or injuring an enemy, or as an instrument of offensive or defensive combat," ' (2) under the circumstances of the case, immediately useable to inflict serious or deadly harm (*e.g.*, unloaded gun or starter's pistol useable as a bludgeon); or (3) actually used in a way likely to inflict that sort of harm (*e.g.*, microphone cord used as a garrote)."

*Id.* at 600, 552 A.2d at 880 (citation and footnote omitted).

Thus, in the aggravated robbery context, we know from the use actually made of an instrument, or from the fact that, under the circumstances, an instrument is immediately useable to inflict serious or deadly harm, that the instrument is a dangerous or deadly weapon. And, in the carrying context under § 36, we know, because the Legislature has told us, that certain instruments are dangerous or deadly weapons *per se*. Our cases have not resolved, however, the standard for determining whether an instrument which is not, *per se*, a dangerous or deadly weapon, is such a weapon when it is simply carried, without actual or imminent use. That is the issue presented here.

█ Resolution of this question has been foreshadowed by the discussion in *Simpler v. State*, 318 Md. 311, 568 A.2d 22 (1990). There the State contended that a stop and frisk was justified by a police officer's knowledge that the defendant had carried a carpet knife on a prior occasion. No arrest was made on that earlier occasion when the defendant "showed" the officer the knife when asked if he had any weapons. *Id.* at 314, 321, 568 A.2d at 23, 27. We said:

"But [the officer's] description of the earlier occasion when he was in [the defendant's] presence is devoid of any aspect of dangerousness. The record does not describe the carpet knife. The necessary inference is that it is a knife which may lawfully be carried, just as the ordinary pocket knife may lawfully be carried. On the earlier occasion, [the officer], knowing that [the defendant] had the knife in his possession, continued whatever their conversation was within the close confines of a police car. There is no indication that [the defendant] was hostile toward [the officer], or police officers generally, based on the prior contact between the two. There is no evidence of what [the defendant's] employment was, whether the knife was a job tool, or whether the contact took place at a job site during working hours. There is no evidence indicating that [the defendant] regularly carried the knife."

*Id.* at 321, 568 A.2d at 27. Implicit in this analysis is that all knives are not dangerous or deadly weapons and that, depending on the circumstances, the concealed carrying of some cutting tools may be considered lawful.

The State's construction of § 36(a), which requires only an intent to carry the instrument in a concealed fashion, looks only to the object's physical potential as a weapon, without considering the purpose of the person carrying the instrument. The State's construction produces results so closely approaching the absurd that we do not consider it to be the construction intended by the General Assembly. For example, the carpenter who carries screwdrivers, drills, chisels, and one or more hammers in a closed tool box is carrying, concealed, potential daggers and clubs, and would violate § 36. The woman who affixes her hat with a hat pin, covered by the hat and by her hair, is carrying, concealed, a potential stiletto, and would violate § 36. Persons who wear belts around their waists, covered by coats, jackets, or sweaters, carry, concealed, potential garrotes, and would violate § 36.

The State's answer at oral argument to these *reductio ad absurdum* examples is that the concealed wearing and carrying of such items on or about the person would not be criminally charged, in the exercise of the police officer's or the prosecutor's discretion. That construction of § 36(a), however, raises due process questions concerning notice to the public of the conduct that is considered criminal. A construction of a statute which would cast doubt on its constitutional validity should be avoided.

■ In order to violate § 36(a) by the concealed wearing or carrying of an instrument which has not legislatively been declared to be a dangerous or deadly weapon *per se*, the trier of fact must first determine whether the instrument constitutes a "dangerous or deadly weapon." The concealed carrying prohibition of § 36(a) is not violated simply because the instrument can be used to inflict serious or deadly harm. The person carrying the object must have at least the general intent to carry the instrument for its use as a weapon, either of offense or defense. It is a question of fact, to be decided based on all of the circumstances.

Thus, reasonable persons would agree that carpenters arriving at work and carrying their tools in enclosed boxes from their cars to the job site, are not carrying concealed, dangerous or deadly weapons because they do not intend to use their tools as weapons. In the language of § 36(a), they are not carrying a "weapon." On the other hand, a youth in a high crime neighborhood, who carries a fixed blade knife strapped to his calf beneath his trousers, would ordinarily be carrying the knife to use it as a weapon. Such a carrying would fall within the concealed carrying prohibition of § 36(a), even if additional facts might make applicable the exception of § 36(d).

The State argues that, because the offense of carrying a weapon openly requires proof of "the intent or purpose of injuring any person in any unlawful manner," the Legislature could not have intended that there be any more specific

intent element for the concealed carrying offense than an intent to carry in a concealed fashion. The specific requirement of an intent to injure for the crime of open carrying, coupled with the absence of an express intent requirement for the crime of concealed carrying, might indeed indicate that an intent to injure is not an element of concealed carrying. That does not foreclose, however, a more generalized intent requirement for concealed carrying of a weapon. Indeed, an intent to carry the object so that it is available for use as a weapon is required under both prongs of the statute.

 If the State proves that a person openly has carried, for example, a utility knife with "the intent or purpose of injuring [another] person in any unlawful manner," the State necessarily has proved the open carrying of the utility knife for its use as a weapon. But the State also has proved much more. On the other hand, the intent required for a prohibited concealed carrying, as we construe § 36(a), requires only an intent to carry the utility knife for its use as a weapon. There need be no intent to injure another. A person may carry a utility knife for its use as a weapon where the person's intent merely is to display the knife in the belief that the display will deter aggressors, without any intent to inflict bodily injury.

The State submits that inclusion in § 36(a) of the exception for penknives without switchblades is inconsistent with requiring an intent that any other object, which is not dangerous and deadly *per se*, be carried for its use as a weapon. The argument assumes that intent is not an element of the concealed carrying offense and that the only concession made by the General Assembly to a possible lack of intent to carry for use as a weapon is in the penknife exception. As we see it, the General Assembly has created absolute rules at each end of the spectrum of conduct addressed in § 36(a).

At the end dealing with innocent conduct, the General Assembly has concluded that the carrying of penknives is

generally so innocent that it has excepted from § 36(a) any carrying of penknives, without switchblades, under all circumstances. No evaluation of the circumstances is required in order to determine whether there is an intent to carry the penknife for its use as a weapon. Consequently, a person who sharpens and then pockets a penknife, announcing that it will be used to slash the face of an enemy, is carrying the penknife for its use as a weapon, but does not violate § 36(a) by that concealed carrying. At the other end of the spectrum the General Assembly has announced that some instruments are dangerous or deadly weapons *per se*, without regard to the circumstances. Consequently, one may hypothesize the filming of a martial-arts motion picture. The person responsible for props carries, from a trailer to the set where the filming is to take place, a bag containing nunchakus. The custodian of props in our illustration facially violates § 36(a) although there is no intent on the custodian's part to use the *per se* weapons as weapons. Between these extremes lies a vast expanse of human conduct involving the concealed carrying of objects. Whether those objects are carried as weapons can be determined, as a question of fact, by applying the common experience of persons in our society to the facts and circumstances in a given case. In our judgment that is what the General Assembly intended in § 36(a).

Other jurisdictions that have considered similar issues have reached the same conclusion. For example, the concealed weapons prohibition in the District of Columbia Code provides simply:

> "No person shall within the District of Columbia carry either openly or concealed on or about his person ... any deadly or dangerous weapon capable of being so concealed."

D.C.Code Ann. § 22–3204 (Supp.1992).

The test which has been established under this District of Columbia statute is set forth below:

> "A deadly or dangerous weapon is one which is *likely* to produce death or great bodily injury by the use made

of it. Such instrument may be dangerous in its ordinary use as contemplated by its design and construction, or where the purpose of carrying the object, under the circumstances, is its use as a weapon.

"This court has previously held that all knives are not per se dangerous weapons. *Degree v. United States,* D.C.Mun.App., 144 A.2d 547 (1958). A knife may be used as a tool in certain trades or hobbies or it may be carried for utilitarian reasons. Section 22–3204 does not prohibit the carrying of such instruments for a legitimate purpose. The statute, as we interpret it, outlaws the carrying of an otherwise useful object where the surrounding circumstances, such as the time and place the defendant was found in possession of such an instrument, or the alteration of the object, indicate that the possessor would use the instrument for a dangerous purpose."

*Scott v. United States,* 243 A.2d 54, 56 (D.C.1968) (footnotes omitted).

*Scott* involved the concealed carrying in a movie theater of a "thin folding knife, ten inches long when extended, with a blade slightly more than 4½ inches from shank to tip." *Id.* at 55. Those facts were sufficient to support a conviction under D.C.Code Ann. § 22–3204. *Id.* at 56; *see also Nelson v. United States,* 280 A.2d 531 (D.C.1971) (conviction affirmed where during the evening hour the defendant stood in front of the cash register at a public eating establishment, a considerable distance from his home, carrying a kitchen knife in his belt); *Clarke v. United States,* 256 A.2d 782 (D.C.1969) (conviction affirmed where defendant, arrested on suspicion of robbing pedestrian on busy commercial street in mid-afternoon, was found to be carrying a straight razor); *Leftwitch v. United States,* 251 A.2d 646 (D.C.1969) (conviction affirmed where defendant, who had been observed attempting to enter parked automobiles, drew butcher knife from behind his back and discarded knife as police approached); *Best v. United States,* 237 A.2d 825 (D.C.1968) (conviction affirmed where defendant, arrested at 12:45 a.m. on a Saturday

morning in the hallway of a privately owned building, was carrying a hawk-billed knife which defendant said he had used earlier in laying linoleum); *Perry v. United States,* 230 A.2d 721 (D.C.1967) (conviction affirmed where defendant had altered hawk-billed linoleum clasp knife so that cutting edge of blade faced forward and blade extended at a right angle to the handle).

The concealed deadly weapon statute in Florida is structured similarly to that of Maryland.[6] The weapons specifically listed in the statute include neither a single edged, safety-razor blade nor a letter opener. In *P.C. v. State,* 589 So.2d 438 (Fla.Dist.Ct.App.1991), a juvenile was carrying a ruler which could be pulled apart to reveal a letter opener. The juvenile's adjudication of delinquency in connection with a charge of carrying a concealed weapon was reversed because of "a total lack of evidence ... 'that the juvenile intended to use the instrument as a deadly weapon'." *Id.* at 439. Of like effect is *Robinson v. State,* 547 So.2d 321 (Fla.Dist.Ct.App.1989). In a reputed drug area the defendant consented to a police search which revealed a single edged blade for a safety razor, resulting in the defendant's arrest for carrying a concealed weapon. At the station house the police found a baggie of cocaine in the defendant's mouth and another baggie in a pocket of his trousers. Conviction on the weapons charge was reversed, based on the following reasoning:

"We are aware, as are most persons nowadays, that a razor blade is a common tool used by cocaine users to 'draw a line' for ingestion. Whether this blade was for

---

6. Florida Statutes Annotated § 790.01(1) (West 1992), provides that "[w]hoever shall carry a concealed weapon ... on or about his person shall be guilty of a misdemeanor of the first degree." "Concealed weapon" is defined to mean "any dirk, metallic knuckles, slungshot, billie, tear gas gun, chemical weapon or device, or other deadly weapon carried on or about a person in such a manner as to conceal the weapon from the ordinary sight of another person." *Id.* § 790.-001(3)(a).

that purpose is unknown but there is no evidence it was carried as a weapon."

*Id.* at 323.

The analysis which we apply under § 36(a) is also found in *State v. Blea,* 100 N.M. 237, 668 P.2d 1114 (Ct.App.1983), a case interpreting an ordinance of the City of Albuquerque. The ordinance prohibited the carrying of a deadly weapon, which was defined to be "any weapon which is capable of producing death or great bodily harm." *Id.* at 238, 668 P.2d at 1115 n. 1. On the evening preceding the defendant's arrest there had been "trouble" in the section of the city that the arresting officers were patrolling. *Id.* at 238 n. 1, 668 P.2d at 1115. Around midnight the defendant, whose attire identified him as a member of a local gang, was arrested for jaywalking and searched. He carried the parts of a broken voltage tester that he said he had found. In one pocket were wire, some plastic and a clip. In another pocket he carried a part resembling an ice pick with a one and one-half inch point.

The trial court, sitting nonjury, convicted. It construed the ordinance merely to require possession of a concealed article that could be used as a weapon, without regard to the purpose of carrying the article. The appellate court, reasoning as follows, reversed and remanded.

"We, like other jurisdictions, construe this statute to include the factual test whether, under the surrounding circumstances, the purpose of carrying the object was for use as a weapon. This does not mean that proof of intent to actually use the article to inflict bodily harm is necessary; the test is whether the purpose of carrying the item was its use as a weapon.

"Factors to be considered include (1) the nature of the instrument, *i.e.,* its size, shape, condition and possible alteration; (2) the circumstances under which it is carried, *i.e.,* the time, place and situation in which defendant is found with it; (3) defendant's actions *vis-a-vis* the item; and (4) the place of concealment."

*Id.* at 238–39, 668 P.2d at 1115–16 (citations omitted); *see also State v. Baldwin,* 571 S.W.2d 236, 241 (Mo.1978) (en banc) ("[E]veryday instruments [such as butcher knives, steak knives and ice picks] become dangerous or deadly only when they are used or carried for use as a weapon."); *People v. Mack,* 64 Mich.App. 587, 236 N.W.2d 523 (1975).

■ In the matter before us, the evidence was legally sufficient to permit the fact finder to conclude beyond a reasonable doubt that Anderson was carrying the utility knife for its use as a weapon. Anderson was not going to, at, or coming from, a place of legitimate employment where the knife would be used to perform tasks in that employment. Rather, he was in an open air drug market during prime shopping hours. He was observed standing on the street talking to the occupants of an expensive sports car— activity that fact finders could conclude was the curb service offered by retailers at open air drug markets. When the police arrived on the scene, retailer and customers separated and moved away from the police. The combination of the soap, glassine bags and utility knife support a finding that Anderson was engaged in the scam of selling small pieces of soap as crack cocaine. Under all of these circumstances a fact finder could conclude that Anderson carried the knife as a weapon for use against potentially irate customers, for use against those who might seek to take his inventory, believing it to be crack cocaine, or for use against those who would attempt to take the proceeds of his sales. On the other hand, a fact finder could conclude that the knife was not carried as a weapon, for example, that it was carried only to use for whittling the soap into pieces of purported crack cocaine.

Because the circuit judge based Anderson's conviction under § 36 apparently on the basis that the utility knife was a dangerous and deadly weapon *per se,* without considering Anderson's intent in fact, we reverse the conviction and remand for a new trial.

JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED. CASE REMANDED TO THAT COURT FOR

THE ENTRY OF A JUDGMENT VACATING THE JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AND REMANDING THIS ACTION TO THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY FOR A NEW TRIAL ON COUNT II (CARRYING A CONCEALED DEADLY WEAPON) OF THE INFORMATION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY ANNE ARUNDEL COUNTY, MARYLAND.