843 A.2d 240

**James Leonard CHILCOAT**

v.

**STATE of Maryland.**

**No. 2032, Sept. Term, 2002.**

Court of Special Appeals of Maryland.

March 3, 2004.

William E. Nolan (Stephen E. Harris, Public Defender, on the brief), Baltimore, for Appellant.

Rachel Marblestone Kamins (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for Appellee.

Panel: DAVIS, JAMES R. EYLER, ADKINS, JJ.

ADKINS, Judge.

James Leonard Chilcoat, appellant, was convicted by a jury in the Circuit Court for Talbot County of first degree assault and carrying a dangerous weapon openly with the intent to injure. The trial court sentenced appellant to a term of fifteen years incarceration with all but one year suspended for the assault conviction, and to a three year sentence with all but two and one-half years suspended for the weapon conviction, six months to be served consecutive to the assault sentence. Chilcoat presents four questions, which we have reordered:

I. Was the evidence sufficient to sustain his conviction for first degree assault?

II. Was the evidence sufficient to sustain his conviction for carrying a dangerous weapon openly with intent to injure?

III. Did the trial court err by failing to merge the weapon conviction into the conviction for first degree assault?

IV. Did the trial court err by awarding restitution directly to the victim's creditors?

We hold that the evidence was sufficient to sustain Chilcoat's conviction for first degree assault, and we affirm Chilcoat's conviction for that offense. We hold that the evidence was insufficient to sustain Chilcoat's conviction for carrying a deadly weapon openly with intent to injure and that the trial court should not have awarded restitution directly to the victim's creditors. We therefore reverse Chilcoat's conviction on the weapon charge and vacate the restitution provision. Chilcoat's third question is therefore moot.

## FACTS AND LEGAL PROCEEDINGS

Chilcoat's convictions are the result of his assault on Andrew Keene, at Pamela Hickman's home on January 20, 2002. About one week before the assault, Hickman and Chilcoat ended their two year intimate relationship. Because Chilcoat was married and Hickman believed "he had no intentions on leaving his wife[,]" she concluded that "[h]e wasn't doing nothing but hurting me and my son and his family." According to Hickman, about a week before the assault, Chilcoat entered a local bar or club called Pepper Jack's, saw Hickman sitting with Andrew Keene, and told her that he never wanted to see her again.

On January 20, 2002, Hickman invited Keene to her home in Easton for dinner. Keene arrived sometime around 3:00 or 3:30 that afternoon. Sometime after that, Chilcoat "pulled up in [her] driveway kind of fast." Hickman was in the kitchen at the time, but Chilcoat's arrival scared her, so she went into the living room.

Keene testified that Chilcoat came into the house through the back door. They argued, each telling the other to leave, but neither man did. According to Keene, Chilcoat told him that he had been seeing Hickman for two years and that Keene "came sneaking in the back door."

When Chilcoat walked toward the living room, Keene followed "because [he] was afraid that [Chilcoat] would hurt Ms. Hickman." Chilcoat then turned around and said, "I'll show you who's going home." Keene put his hands up to defend himself. The next thing Keene remembered was waking up on the kitchen floor and hearing Chilcoat's van leaving.

Brian Hickman,[1] Pamela Hickman's son, was sleeping in the living room when his mother came into the room and told him that Chilcoat had just arrived. Brian got up and went to the area where the kitchen and living room meet. He heard Chilcoat and Keene arguing. When he saw Chilcoat pick up a beer stein, he called to his mother that they were fighting. "[T]hat's when Andy never got up and [Chilcoat] left[.]" Brian described the incident:

I seen Andy and [Chilcoat] started arguing by saying get out of the house. And then [Chilcoat] said he dated mom for 2 years and then Andy said well just get out and then Jim walked over to ... our little Budweiser stand we have and grabbed that mug and took it over to Andy and hit him 4 or 5 times in the back of the head and then made a comment, look he's dead.

Brian did not hear Keene threaten Chilcoat, nor did he see anything in Keene's hand when he fell.

Hickman did not see the fight, but returned to the kitchen when Brian yelled that Chilcoat and Keene were fighting. She saw Chilcoat standing over Keene with the beer stein in his hand. After Chilcoat put down the stein and left, Hickman tried to get Keene up, but he was initially unresponsive. When she was able to get him to the counter, she called the

---

1. To avoid confusion with Pamela Hickman, we shall refer to Brian Hickman by his given name.

police and an ambulance. Asked how long Chilcoat had been in her home before she heard Brian screaming that they were fighting, she replied, "It happened very fast."

Chilcoat testified that he and Hickman had spent all but one Sunday together during the year prior to the incident. He said that he had spent the night at Hickman's house on the Thursday prior to the fight and that he had told Hickman that he would move in that Sunday. He reported that he had telephoned that morning and left messages "on her answering machine and on her personal phone that I was on my way." He said that he had been to her house earlier that day and had left a note on her door saying he would be back.

Chilcoat said that he had known Keene "a little bit" from seeing him "at the bar," "just to talk to." Chilcoat denied having seen Hickman and Keene together at Pepper Jack's and telling her that he did not want to see her anymore.

Chilcoat's version of what happened when he initially entered Hickman's house was similar to Keene's. According to Chilcoat, however, Keene "got all jumpy and he reached over and grabbed something off the counter." Chilcoat reported that he then grabbed the mug. He said that after they each had picked up something, they continued telling each other to leave. He said, "And I turned my head looking towards the living room waiting for somebody to walk in and Andy just flew at me." He said that he had the mug in his hand, and "it was just 4 or 5 seconds and it was just 1, 2, 3, 4 like that real quick blows, that was all."

Chilcoat maintained that the last blow, which hit the top of Keene's head, occurred while Keene was pushing him backwards. He said that Keene's weapon cut his fingers and that he was bleeding "through the chest." He said that his hand was bleeding and that he had bled "all over the mug." He said that Keene was getting up when he left and that he left because Keene "had already came at me once."

Hickman, testifying in rebuttal, confirmed that Chilcoat had left several messages on her phone, including one telling her that he would be there around 11:00 or 11:30. She said that

she had left home for about an hour because she did not want to be there when he came. He also left a message saying he had "already taken care of" Keene. She reported that after the incident, Chilcoat was not injured and she did not see him bleeding.

Additional facts will be set forth as needed in our discussion of the issues presented.

## DISCUSSION

### I.

### First Degree Assault

### The Medical Evidence

Keene testified that he did not remember being struck, indicating that he lost consciousness as a result of the blows. This was corroborated by Pamela Hickman's testimony that Keene was initially unresponsive when she went to help him up. Keene was taken by ambulance to Easton Memorial Hospital where medical personnel took CT scans and x-rays. Because the hospital did not have a neurologist available, Keene was transferred to Peninsula Regional Medical Center. There, he had surgery in which a portion of his skull was replaced with wire mesh. Photographs of Keene's external injuries were admitted into evidence.

Dr. Julius Zant, a neurosurgeon, testified that he saw Keene at Peninsula Regional Medical Center and determined that he had two depressed skull fractures. He reported that the CT scan showed open depressed fractures that "raise[d] the risk of infection." He reported that he performed surgery to debride the areas to prevent seizures and infection. He testified that the skull on the right side of Keene's head was in little pieces and that he had to remove that portion of the skull. To protect the "soft exposed area beneath where the bone is missing[,]" he replaced it with mesh held in with titanium screws. After the surgery, Keene was given intravenous antibiotics to prevent infection.

Zant also testified that it would be unusual for someone to die from an injury such as Keene's; it would be more likely for the injury to result in a treatable infection or abscess. Abscesses were not likely when such injuries were treated appropriately, but they "can be fairly likely" if the injury were left untreated. Even if treated, abscesses could result in blindness or paralysis, and, if not treated, they could result in death.

Zant explained that Keene's surgery was necessary, not simply to avoid infection, but because Keene "had a depressed skull fracture that required elevation and debridement." Zant added that, "[h]ad [the injuries] been an inch or two in either direction [Keene] may well have" died.

Keene's medical records were admitted into evidence. They indicate that Keene was discharged from the hospital on January 26, 2002, and was to receive post-operative care.

## The Parties' Contentions

Chilcoat contends that the evidence was not sufficient to sustain his conviction for first degree assault because the medical testimony indicated that (1) the injury was not likely to result in death, (2) it did not cause any sensory or motor deficit, and (3) Keene did not suffer any dizziness or vomiting. The State counters that Dr. Zant's testimony established that Keene had two depressed skull fractures, that he removed a portion of Keene's skull and replaced it with titanium mesh, and that complications could include a brain abscess that could result in paralysis or blindness. The State also points to Zant's testimony that death would have been likely had the blows been "an inch or two in either direction."

## Standard Of Review

The standard for our review of the sufficiency of the evidence is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See White v. State,* 363 Md. 150, 162, 767 A.2d 855 (2001). "Weighing the credibility of witnesses and

resolving any conflicts in the evidence are tasks proper for the fact finder." *State v. Stanley*, 351 Md. 733, 750, 720 A.2d 323 (1998).

## Discussion

■ Md. Code (1957, 1996 Repl. Vol.), Art. 27 section 12A 1(a)(1),[2] proscribing first degree assault, provides that "[a] person may not intentionally cause or attempt to cause serious physical injury to another." "Serious physical injury" is defined in Art. 27 section 12(c)[3] as a physical injury that:

(1) Creates a substantial risk of death;

(2) Causes serious permanent or serious protracted disfigurement;

(3) Causes serious permanent or serious protracted loss of the function of any bodily member or organ; or

(4) Causes serious permanent or serious protracted impairment of the function of any bodily member or organ.

Keene suffered two skull fractures and required neurosurgery to prevent the possibility of brain abscesses or seizures. Although Keene's injuries, with proper treatment, were not likely to cause death, Zant testified that abscesses were "fairly likely" without appropriate treatment, and that abscesses could result in death. He also opined that even if treated, abscesses could result in such problems as blindness or paralysis. Zant explained that he had to replace a portion of Keene's skull with mesh, and that a blow one or two inches on either side of the injured spots would have been likely to cause death.

■ Keene's successful recovery does not change the nature of the injury he suffered. In determining whether an injury creates a substantial risk of death, the focus is on the

---

**2.** This section has been rewritten without substantive change and reenacted as Md.Code (2002), section 3–202(a)(1) of the Criminal Law Article (CL).

**3.** This section has been rewritten without substantive change and reenacted as CL § 3–201(c).

injury, not how well the victim responded to medical treatment. As the Court of Appeals of Alaska explained:

"Serious physical injury" may be proved, *inter alia,* by evidence establishing that the defendant inflicted physical injury by "an act performed under circumstances that create a substantial risk of death." This definition of serious physical injury focuses on the circumstances in which the defendant performed the act that caused physical injury. The fortuity of prompt medical treatment and speedy recovery by the victim is not a primary consideration.

*Konrad v. Alaska,* 763 P.2d 1369, 1376 (Alaska Ct.App.1988) (citation omitted). *See also New Jersey v. Turner,* 246 N.J.Super. 22, 586 A.2d 850, 853 (App.Div.), *cert. denied,* 126 N.J. 335, 598 A.2d 892 (1991)("a determination of whether the victim was subjected to a substantial risk of death requires the primary focus to be upon the nature and extent of the injury rather than on the effectiveness of medical treatment"); *St. Clair v. Texas,* 26 S.W.3d 89, 101 (Tex.Ct.App.2000)(" 'The relevant inquiry is the extent of the bodily injury as inflicted, not after the effects have been ameliorated or exacerbated by medical treatment' ")(pet. for review refused). Here, Zant's testimony made it clear that Keene's injuries created a substantial risk that Keene would have died without medical treatment.

In addition, the statute prohibits not only causing, but attempting to cause, a serious physical injury to another. *See* Art. 27 § 12A–1(a)(1). Although the State must prove that an individual had a specific intent to cause a serious physical injury, *see Dixon v. State,* 364 Md. 209, 239, 772 A.2d 283 (2001), a jury may infer the necessary intent from an individual's conduct and the surrounding circumstances, whether or not the victim suffers such an injury. *See Ford v. State,* 330 Md. 682, 703, 705 n. 9, 625 A.2d 984 (1993). Also, the jury may "infer that 'one intends the natural and probable consequences of his act.' " *Id.* at 704, 625 A.2d 984 (citation omitted).

Here, Chilcoat grabbed a beer stein and hit Keene in the head four or five times. The jury saw photographs of Keene's external injuries, the beer stein with which Chilcoat hit Keene, and Keene's medical records. The jury could determine whether inflicting a serious physical injury was the natural and probable consequence of hitting Keene with the stein. In addition, the evidence established that Chilcoat and Keene were rivals for Hickman's affections and that Chilcoat saw Keene as an interloper in his relationship with Hickman. When Chilcoat encountered Keene in Hickman's home and Keene refused to leave, Chilcoat deliberately grabbed a beer stein and hit Keene on the head four or five times, until Keene was rendered unconscious. After rendering Keene unconscious, Chilcoat commented, "Look, he's dead." The evidence was clearly sufficient for the jury to conclude that Chilcoat intended to inflict a serious physical injury on Keene.

## II.

### Carrying A Weapon Openly With Intent To Injure

Chilcoat is more successful with his contention that the evidence was insufficient to show that the beer mug was "worn" or "carried" within the meaning of Md. Code (1957, 1996 Repl. Vol.), Art. 27 section 36. Citing *Thomas v. State,* 143 Md.App. 97, 792 A.2d 368, *cert. denied,* 369 Md. 573, 801 A.2d 1033 (2002), and *State v. Stouffer,* 352 Md. 97, 721 A.2d 207 (1998), he asserts that the evidence showed "mere use" of a weapon. He argues that, "had the Legislature intended that a defendant receive an additional three-year sentence every time a dangerous or deadly weapon is used to commit an assault, the Legislature would have added the word 'use' to section 36(a)." The State disagrees, asserting that Brian Hickman's testimony that Chilcoat "carried" the beer mug before hitting Keene with it satisfied the statute. We agree with Chilcoat and explain.

### The Statute

Chilcoat was convicted of violating section 36, which provides, in pertinent part:

## § 36. Carrying or wearing concealed weapon; carrying openly with intent to injure;

(a) *In general.*—(1) Every person who shall wear or carry any dirk knife, bowie knife, switchblade knife, star knife, sandclub, metal knuckles, razor, nunchaku, or any other dangerous or deadly weapon of any kind, ... concealed upon or about his person, and every person who shall wear or carry any such weapon ... openly with the intent or purpose of injuring any person in any unlawful manner, shall be guilty of a misdemeanor....

■■ " 'The cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature.' " *Degren v. State,* 352 Md. 400, 417, 722 A.2d 887 (1999) (citations omitted). To determine legislative intent, we look primarily to the language of the statute itself. *See Marriott Employees Fed. Credit Union v. Motor Vehicle Admin.,* 346 Md. 437, 444–45, 697 A.2d 455 (1997). "We give the language of the statute its natural and ordinary meaning, keeping in mind the aim and objective of the statute." *Jones v. State,* 357 Md. 141, 159, 742 A.2d 493 (1999). "[W]e are always free to look at the context within which statutory language appears. Even when the words of a statute carry a definite meaning, we are not 'precluded from consulting legislative history as part of the process of determining the legislative purpose or goal' of the law." *Morris v. Prince George's County,* 319 Md. 597, 603–04, 573 A.2d 1346 (1990) (citations omitted).

### Weapons In The Home

In *Anderson v. State,* 328 Md. 426, 432, 614 A.2d 963 (1992), the Court of Appeals observed that the purpose of the statute in relation to concealed weapons was twofold:

Criminal statutes dealing with concealed weapons serve two related purposes. First, they seek to protect the public by deterring persons from concealing on or about their persons weapons of which the public would be unaware, thereby preventing injury or death to unsuspecting members of the

public. Second, these statutes protect the wearers or carriers of weapons from themselves, by attempting to deter persons from having at hand weapons that could be used in the heat of passion. (Citations omitted.)

In *State v. Brinkley*, 102 Md.App. 774, 776–77, 651 A.2d 465 (1995), we gave a broad reading to the statute, and declined to exclude weapons carried inside the home.

The operative language of section 36 has remained essentially unchanged since the statute was first enacted in 1886. At no time in the statute's long history has the legislature seen fit to express any limitation on where a defendant must be situated when carrying a concealed weapon. The plain language of section 36, therefore, supports the interpretation that the statute was intended to apply universally, to both public and private property.

Six years later, in *In re Colby H.*, 362 Md. 702, 721, 766 A.2d 639 (2001), the Court of Appeals, albeit dealing with a concealed weapon, noted that, "[s]ection 36 is attempting to prevent incidents on public streets and in publicly accessible areas." It recognized that

Article 27, section 36 was intended by the Legislature to apply, generally, to persons traveling or congregating on public streets or areas generally accessible to the public. It was not designed to apply to people on their private property or people who reside in, or are an invited guest on that property when the owner has knowledge of the weapon.

*See id.* at 721–22, 766 A.2d 639. In *Colby H.*, the Court of Appeals held that "wearing and carrying" a dangerous or deadly weapon in violation of section 36 could not be established by evidence that the person concealed it within the property where he resided, because "a person in legal possession of a dangerous and deadly weapon may conceal or store it as long as they are on property, which they own, or are a legal resident of[.]" *Id.* at 723, 766 A.2d 639. The evidence against Colby showed merely that he had concealed a shotgun under the mattress in his bedroom, after obtaining it on a street corner. There was no evidence of how Colby transported the

shotgun from the street corner to his home, and no evidence that Colby had "the general intent of doing anything other than placing the weapon in its hiding place in the bedroom of his home, presumably a place of safety to him." *Id.* at 714, 766 A.2d 639.

Again taking a broad view of the statute, this Court distinguished *Colby H.* in *Thomas v. State,* 143 Md.App. 97, 792 A.2d 368, *cert. denied,* 369 Md. 573, 801 A.2d 1033 (2002). Thomas argued that *Colby H.* proscribed his conviction for wearing or carrying a dangerous weapon openly with the intent to injure because the wearing or carrying occurred inside his own residence. Notwithstanding the broad language in *Colby H.* suggesting that section 36 generally distinguishes between public and private property, we rejected Thomas's argument, characterizing *Colby H.* as "inapposite[:]"

> In contrast to *In re Colby H.,* appellant was not accused of concealing the weapons in his home. Rather, the State claimed that he openly carried them with intent to injure and the jurors were instructed to that effect. We do not read *Colby H.* as sanctioning the carrying of a legal weapon in one's own home, when it is done openly and with the intent to injure.... Although there are certain exceptions, one ordinarily cannot intentionally injure another with a legal weapon, merely because the event occurs in the privacy of the home. In much the same way, we do not believe that Art. 27, § 36 permits a person to carry a weapon openly, when done with the intent to injure, even if such conduct occurs in one's residence.

*Id.* at 121, 792 A.2d 368.

### The Carrying Requirement

 *Colby H.* also addressed the meaning of the "carrying" requirement:

> "Carry," taken in its plain meaning, is defined as "to move while supporting; convey; transport" or "to wear, hold, or have around one." *The Random House Dictionary of the English Language* 227 (1983). Similarly, "wear" is defined

as "to carry or have on the body or about the person as a covering, equipment, ornament, or the like." *Id.* at 1616. Recently, the Supreme Court of the United States utilized *Black's Law Dictionary's* definition of "Carry arms or weapons" as "[t]o wear, bear or carry them upon the person or in the clothing or in a pocket, for the purpose of use, or for the purpose of being armed and ready for offensive or defensive action in case of a conflict with another person." *Muscarello v. United States,* 524 U.S. 125, 130, 118 S.Ct. 1911, 1915, 141 L.Ed.2d 111 (1998).... However, the Supreme Court in *Muscarello* also recognized another "form of an important, but secondary, meaning of 'carry,' a meaning that suggests support rather than movement or transportation, as when, for example, a column 'carries' the weight of an arch. In this sense a gangster might 'carry' a gun (in colloquial language, he might 'pack a gun') even though he does not move from his chair." The statute plainly states that it is a violation for a person to *"wear or carry"* a concealed deadly weapon.... We hold that the Legislature ... intended that the weapon needed to be on the body or about the person and concealed. It is not necessary that the weapon actually be transported from place to place.

*In re Colby H.,* 362 Md. at 712–13, 766 A.2d 639 (some citations omitted.)

In *Harrod v. State,* 65 Md.App. 128, 499 A.2d 959 (1985), we applied the "carrying" requirement in deciding that the defendant's movement within his home violated section 36(a)(i). A male friend was visiting Harrod's wife when they thought Harrod was not home. According to Harrod's wife, " 'all of a sudden [Harrod] came out of the bedroom with a hammer in his hand, swinging it around, coming after me and my friend[.]' " *See id.* at 131, 499 A.2d 959. Harrod threw the hammer, then "reentered the bedroom and returned with a five-inch blade hunting knife" and put it into the bannister near his wife's arm. *See id.* We affirmed Harrod's convictions for assault and carrying a deadly weapon openly with intent to injure. *See id.* at 140, 499 A.2d 959.

*Harrod* differs from this case because Harrod carried the hammer from the bedroom to the living room and then made another trip to the bedroom to retrieve the hunting knife and bring it back. These actions contrast with Chilcoat's action in merely picking up a beer stein that was convenient to him and walking a few steps with it to reach the victim.

In *Thomas,* we articulated restrictions on the nature of the movement that would qualify as "carrying." Thomas was convicted of second degree murder and two counts of wearing or carrying a weapon openly with the intent to injure. *See Thomas,* 143 Md.App. at 102, 792 A.2d 368. Although Thomas testified that the victim had fallen and hit her head, medical testimony indicated that she died of multiple blunt force trauma, and that some of her injuries were consistent with having been hit with a hammer and others were consistent with having been cut by a serrated knife. *See id.* at 105–06, 792 A.2d 368.

We held the evidence was not sufficient to sustain Thomas's convictions for wearing or carrying a weapon openly with intent to injure:

> In order to establish the offenses in issue, **we believe the State was required to prove more than mere use of the weapons by appellant** or recovery of them in his one-room residence, in the vicinity of the victim. If we were to adopt the State's position, it would mean that almost any time a person commits an offense with a dangerous weapon, he or she could also be convicted of having carried the weapon openly, with intent to injure.

*Id.* at 123, 792 A.2d 368 (emphasis added).

The State distinguishes *Thomas,* arguing that here, "[Chilcoat] was observed picking up the beer stein, carrying it toward [the victim], and using it to inflict four or five blows to the back of [the victim's] head." (State's brief, 6). In deciding whether Chilcoat's convinced movement was sufficient to qualify as "carrying" the dangerous weapon, rather than merely using it, we examine cases from other jurisdictions

looking for persuasive authority explicating this "use-carrying" distinction.

Like *Thomas,* cases from other jurisdictions distinguish between the "use" of a weapon and its being carried. In *Massachusetts v. Atencio,* 345 Mass. 627, 189 N.E.2d 223, 226 (1963), the Supreme Judicial Court of Massachusetts held that the evidence was insufficient to convict a defendant of carrying a revolver because he had played Russian roulette. The court observed:

> The temporary possession of the revolver shown by the defendants during the game is not a carrying of a firearm on the person within the meaning of [the statute], as amended. The idea conveyed by the statute is that of movement, "carries on his person or under his control in a vehicle."

*See id.*

In *Massachusetts v. Osborne,* 5 Mass.App.Ct. 657, 368 N.E.2d 1219 (1977), the police found the defendant in the hallway of an apartment house, arguing with other men. Although the men were speaking in Greek, the officer heard the defendant say: "It was only shooting blanks." When the police officer asked Osborne where the gun was, Osborne took the officer to his room, where the gun was lying on his bed. Later, at the police station, Osborne admitted that he had bought the gun in New York. "There was no evidence of when or how the gun got to the defendant's room." *Id.* at 1220. Evidence showed only that "the defendant had picked up the gun and held it while he fired it[.]" *Id.* The court held:

> The issue before us is the meaning of the word "carrying".... [T]he "idea conveyed by the statute is that of movement," and ... "temporary possession [of a firearm] during the actual shooting would not be sufficient under the statute...." The police found the defendant in the hallway, but the gun was found in the defendant's bedroom. There was no evidence from which to infer that the defendant had carried it outside his room. The only legitimate inference is

that the defendant had picked up the gun and held it **while he fired it, but such temporary possession was not sufficient for conviction** of unlawfully carrying a firearm.

*Id.* (emphasis added and citations omitted).

Texas cases similarly hold that a "momentary" possession of a weapon is insufficient to constitute "carrying." In *Pyka v. Texas,* 80 Tex.Crim. 644, 192 S.W. 1066, 1067 (1917), the defendant had picked up a pistol on the ground, hit his opponent with it, and thrown it back down. Following 14 cases in which the Texas courts held that similarly brief and unplanned possession of a weapon did not constitute "carrying" the weapon, the Texas Court of Criminal Appeals held that proof of such acts was insufficient to sustain the defendant's conviction for carrying a pistol on his person. *See id.* In *Aguilar v. Texas,* 710 S.W.2d 779, 780 (Tex.Ct.App.1986) (pet. for review refused 1987), the Court of Appeals of Texas affirmed that "momentary possession of a pistol, even if fired, is insufficient evidence to support" a "carrying" conviction. The court held that a man who picked up a revolver and pointed it at a security guard had not unlawfully carried a handgun. *Id.* The security guard estimated that the defendant had held the gun for about seven seconds. The court relied on precedent holding that momentary possession of a gun without "asportation or conveyance" did not amount to carrying a gun. *See id. Cf. Bohn v. Texas,* 651 S.W.2d 274, 277 (Tex.Ct.App.1983) (explaining that asportation of the weapon is not essential to find "carrying").

Although these extraterritorial cases distinguish between mere temporary or momentary possession and "carrying," as we did in *Thomas,* none of them provide us with a template to decide the issue here—whether Chilcoat's walking several steps, while holding the beer stein, constituted "carrying" that "weapon" rather than merely using it to commit an assault. We reach our decision today by relying on a Maryland Court of Appeals decision addressing an analogous issue-under what circumstances an asportation of a person during the course of a robbery or other offense also constitutes the separate offense of kidnapping.

In *State v. Stouffer,* 352 Md. 97, 113, 721 A.2d 207 (1998), cited by Chilcoat, the Court of Appeals held that the asportation aspect of the kidnapping statute did not include movement of a victim that was merely incidental to another offense. Judge Wilner, writing for the Court, explained:

> We align ourselves with the majority approach that examines the circumstances of each case and determines from them whether the kidnapping—the intentional asportation—was merely incidental to the commission of another offense. We do not adopt, however, any specific formulation of standards for making that determination, but rather focus on those factors that seem to be central to most of the articulated guidelines, principally: How far, and where, was the victim taken? How long was the victim detained in relation to what was necessary to complete the crime? Was the movement either inherent as an element, or, as a practical matter, necessary to the commission, of the other crime? Did it have some independent purpose? Did the asportation subject the victim to any additional significant danger?

*Id.*

Posing comparable questions about the facts of this case provides a method for reaching our decision. Here, Chilcoat carried the beer stein only a short distance and he had no purpose other than to injure the victim. Indeed, most assaults of the battery type involve at least a few steps or other advancement toward the victim. Chilcoat's movement while holding the beer stein was necessary to commit the assault because the beer stein was located on a table several steps away from where Keene was standing. Although use of the beer stein did subject Keene to more severe injuries than he might otherwise have suffered, the seriousness of the injuries is redressed by Chilcoat's conviction for first degree assault. Applying the rationale of *Stouffer,* we see nothing in section 36(a) that suggests the legislature intended that moving toward the victim holding a beer stein in this incidental manner would constitute the additional crime of carrying a weapon openly with intent to injure.

Accordingly, we hold that the evidence was insufficient to sustain Chilcoat's conviction under section 36 for carrying a dangerous weapon openly with intent to injure.

## III.

### Merger

Because we reverse Chilcoat's conviction for wearing or carrying a weapon openly with intent to injure, we need not consider whether that conviction would merge with his conviction for first degree assault.

## IV.

### Restitution Directly To Creditors

Md.Code (2001), section 11–606(a) of the Criminal Procedure Article (CP), provides,

The court may order that restitution be paid to:

(1) the victim;

(2) the Department of Health and Mental Hygiene, the Criminal Injuries Compensation Board, or any other governmental unit; or

(3) a third-party payor, including an insurer, or any other person that has compensated the victim for a property or pecuniary loss under Part I of this subtitle.

Judgments of restitution against Chilcoat were entered in favor of five medical care providers. Chilcoat argues that the trial court was not authorized to order him to pay restitution to a creditor of the victim. The State responds that the trial court committed harmless error.[4]

---

4. The State also argues that the issue was not preserved. We do not agree with any of its non-preservation arguments. A challenge to an illegal sentence may be made at any time. *See* Md. Rule 4–345(a); *Walczak v. State,* 302 Md. 422, 427, 488 A.2d 949 (1985). A sentence is "illegal" within the contemplation of *Walczak* if it is beyond the statutory power of the court to impose. *See Corcoran v. State,* 67 Md.App. 252, 255, 507 A.2d 200, *cert. denied,* 307 Md. 83, 512 A.2d 377, *cert denied,* 479 U.S. 932, 107 S.Ct. 404, 93 L.Ed.2d 357 (1986). The

In *In re Ryan S.*, 369 Md. 26, 797 A.2d 39 (2002), the Court of Appeals held that Art. 27 section 807 did not permit the court to order restitution to the victim's insurance company for payments made directly to a hospital pursuant to an insurance contract. Finding the language of the statute to be "clear and unambiguous," *see id.* at 54, 797 A.2d 39, the Court explained:

> [W]here this statute expressly authorizes restitution to third-party payors, such as insurance companies, for payments made to the victim to compensate the victim for property or pecuniary loss, we shall construe the statute as not allowing restitution in other circumstances.

*See id.* at 56, 797 A.2d 39. *Accord Montgomery v. State*, 292 Md. 155, 162–63, 438 A.2d 490 (1981). Similarly, CP section 11–606(a) does not include creditors as restitution payees. The trial court should not have ordered restitution to them directly.

· The State also argues that the error was harmless because it is of no consequence to Chilcoat whom he pays. In our view, that is immaterial. If, for whatever reason, the legislature has not seen fit to allow restitution directly to health care providers, the trial court does not have authority to order it. We do not see any reason, however, why, upon resentencing, Chilcoat could not be ordered to pay restitution to Keene.

**CONVICTION FOR WEARING OR CARRYING A DANGEROUS WEAPON OPENLY WITH INTENT TO INJURE REVERSED. PROVISION OF RESTITUTION TO MEDICAL PROVIDERS VACATED, AND CASE REMANDED TO THE CIRCUIT COURT FOR TALBOT COUNTY TO RECONSIDER THE RESTITUTION ASPECT OF THE SENTENCE. JUDGMENT AFFIRMED**

---

identity of a restitution payee is a substantive matter. *See Spielman v. State*, 298 Md. 602, 607–08, 471 A.2d 730 (1984)(holding that retroactive application of amendment permitting restitution to be paid to insurance companies constituted an *ex post facto* law). If the trial court was not authorized to order restitution to a creditor, then the provision constituted an illegal sentence.

IN ALL OTHER RESPECTS. COSTS TO BE PAID ONE–HALF BY APPELLANT AND ONE–HALF BY TALBOT COUNTY.